**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

SIERRA CLUB,  )
 )
       Plaintiff,  )
 )  Case No. 1:08-cv-1183
v.  )  Hon. Paul L. Maloney
 )
CITY OF HOLLAND and HOLLAND  )
BOARD OF PUBLIC WORKS,  )  **ORAL ARGUMENT REQUESTED**
 )
       Defendants.  )
 )

**REPLY BRIEF IN SUPPORT OF PLAINTIFF'S FIRST MOTION FOR PARTIAL
SUMMARY JUDGMENT**

MCGILLIVRAY WESTERBERG & BENDER LLC
David C. Bender
Christa O. Westerberg
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
bender@mwbattorneys.com
westerberg@mwbattorneys.com

CULLEN WESTON PINES & BACH LLP
Lester A. Pines
Kira E. Loehr
122 West Washington Avenue, Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:   (608) 251-2883
pines@cwpb.com
loehr@cwpb.com

Plaintiff submits this reply in support of its First Motion for Partial Summary Judgment (Doc. 42) to address the arguments raised by Defendants' Response (Doc. 58) ("Resp.").

**I.     INTRODUCTION.**

EPA's 1992 rulemaking lays out the two conditions for determining when the actual-to-projected-actual test applies to estimate post-project emissions under the Prevention of Significant Deterioration ("PSD") program:

> (1) when a facility is an Electric Utility Steam Generating Unit ("EUSGU"); and
> (2) when the EUSGU has conducted post-project reporting requirements.

40 C.F.R. § 52.21(b)(21)(v)(1992-2003) ("Subsection (v)").

The facts relevant to resolving whether Defendants meet these conditions are not in dispute: Defendants admit that De Young Units 3 and 4 are not "EUSGUs"; and they admit that they did not conduct the post-project reporting required by Subsection (v) for any of the projects undertaken at Units 3, 4, or 5. (Resp. at 13, 16 & n.12, n.15.) Despite the fact that Defendants do not meet the criteria in Subsection (v), they argue that they should nevertheless have the benefit of the actual-to-projected-actual test because they do not qualify for the alternative, actual-to-potential test in § 52.21(b)(21)(iv) ("Subsection (iv)"). Defendants base this argument on their assertion that they had "begun normal operations" prior to the projects at the De Young plant. (Resp. at 14, 18.)

There are three primary problems with Defendants' argument. *First*, EPA made the phrase "begun normal operations" an inoperative relic when its 1992 rulemaking created the new two-part threshold in Subsection (v) for determining whether the actual-to-projected-actual test can be applied. *Second*, even if EPA had not made the phrase "begun normal operations" inoperative in 1992, Defendants apply the wrong definition to that phrase. EPA has defined "begun normal operations" differently than Defendants, and EPA's interpretation of its own

1

regulation is controlling. *Third*, Defendants' claim to the actual-to-projected-actual test in Subsection (v), despite admitting that they do not comply with the two requisite criteria in Subsection (v), cannot be squared with EPA's explicit decisions in 1992 to require compliance with these criteria. Defendants' interpretation would render EPA's explicit decisions meaningless, and is an impermissible attack on EPA's 1992 rulemaking. In addition, contrary to Defendants' arguments, the fact that EPA has not always used the actual-to-potential test in its enforcement actions has no bearing on whether the test can be used in this case.

Finally, Defendants offer no relevant case law to support their argument that they should not bear the burden of proving the defense of routine maintenance, repair and replacement ("RMRR"). Thus, the Court should find that the actual-to-potential test applies to projects conducted between 1992 and 2003, and that Defendants bear the burden of proof on the RMRR issue.[1]

## II. DEFENDANTS IGNORE EPA'S 1992 RULEMAKING THAT REPLACED THE "BEGUN NORMAL OPERATIONS" THRESHOLD.

Defendants cite to pre-1992 case law and EPA statements to argue that the phrase "begun normal operations" in Subsection (iv) is the operative phrase for deciding which of the two tests to apply under the then-existing regulations. This outdated argument ignores EPA's 1992 rulemaking, which added new language in Subsection (iv) and added new Subsection (v) with an intent to replace the "begun normal operations" threshold for determining what test to apply.

---

[1] Contrary to Defendants' argument that summary judgment is not appropriate for disputed legal interpretations, district courts have found summary judgment to be an appropriate and efficient tool for such disputes. *E.g., McDonnell v. Cardiothoracic & Vascular Surgical Assocs.*, No. C2-03-0079, 2004 U.S. Dist. LEXIS 10392, *10 (S.D. Ohio May 27, 2004) ("[I]t is apparent that Rule 56 allows the Court to resolve significant questions of law pretrial so that a court can focus the litigation on the true matters in controversy."); *Libbey Inc. v. Factory Mut. Ins. Co.*, No. 3:06-CV-02412, 2007 U.S. Dist. LEXIS 45160, *21 (N.D. Ohio June 21, 2007) ("The Court finds determining the number of 'occurrences' would expedite the litigation and conserve judicial resources, and therefore the Court will consider [plaintiff's] Motion for Partial Summary Judgment.").

PSD program applicability thus must be made *before* a facility is modified. *See, e.g.*, *U.S. v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 865 (S.D. Ohio 2003) (holding that the PSD program requires a determination of applicability, including emission increases, before the change occurs). Both of the two possible tests for determining whether a change would result in an emissions increase–the actual-to-potential and actual-to-projected-actual—involve a pre-project estimate of post-project emissions. One of these tests must be applied in an enforcement action when the facility failed to make the calculation before the project.[2] As noted above, in its 1992 rulemaking, EPA created a new test in Subsection (v) for determining when the actual-to-projected-actual test can be used to determine whether an increase in emissions would result.

It is true that for two years-- between 1990 (after the Seventh Circuit issued the *WEPCO* decision creating the "like-kind replacement" concept) and 1992 (when EPA promulgated the rules at issue in this motion)-- EPA applied a "begun normal operations" test to determine when it would apply the actual-to-projected-actual test, and it applied the actual-to-potential test to all other projects. 56 Fed. Reg. 27,630, 27,633 (June 14, 1991). As Defendants note, EPA stated that for "like-kind replacements," "normal operations" are assumed to have begun and the actual-to-potential test cannot apply. (Resp. at 10) However, Defendants are wrong when they assert that EPA "would continue to apply the actual-to-projected-actual test under the 1980 Rule to 'like-kind-replacements'" even after the final 1992 rulemaking. (Resp. at 10-11, citing Doc. 59-1 at pp. 4-5 (citing 56 Fed. Reg. 27,630, 27633 & n.10.).) In reality, EPA stated clearly that its

---

[2] Because the tests are intended to be applied prior to a modification, neither test involves simply making the change and waiting to see what post-project emissions are and whether actual emissions have increased, as Defendants seem to suggest. Pl's Br. at 11-22; *U.S. v. So. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/F, 2002 WL 1629817 at *3, *10 (S.D. Ind. July 18, 2002) (rejecting arguments that PSD applicability be based on post-project emissions and holding that applicability must be based on pre-project estimates); *Ohio Edison Co.,* 276 F. Supp. 2d at 865 *("[E]ven though actual data exists* as to the emissions resulting from the eleven projects, *the law does not permit an after-the-fact analysis of the effect of a plant modification,* which otherwise was required by law to obtain a pre-construction permit." (emphasis added)).

"like-kind replacement" and "begun normal operations" distinction was only an *interim* measure "[p]ending final adoption of this new rule" in 1992. 56 Fed. Reg. at 27,633. When EPA issued the final rule it explicitly stated: "In response to comments regarding 'like-kind' replacements, EPA notes that *today's regulations recognize no distinction between 'like-kind' replacements and other nonroutine physical or operational changes at a utility steam generating unit*." 57 Fed. Reg. 32,214, 32,326 (July 21, 1992) (emphasis added).[3]

Thus, instead of estimating emission increases with different tests based on whether a project is a "like-kind replacement," EPA's 1992 rule created a new policy whereby the selection of the actual-to-projected-actual test is only available: (1) to pollution sources qualified as EUSGUs; and (2) to EUSGUs that complied with the requisite post-project reporting to prove the accuracy of the projected-actual estimate. (Pl. Br. 16-19.) Therefore, whether or not the changes made at the De Young Units between 1992 and 2003 were "like-kind replacements" (which is a disputed conclusion of law[4]) is irrelevant to determining which emissions test should be used in this proceeding because EPA explicitly rejected the continued use of that inquiry as the threshold for deciding which emission increase test to apply in EPA's final 1992 rulemaking.

Defendants also repeatedly cite *New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005). (Resp. at 8, 11.) However, nothing in that case supports Defendants' positions. The discussion Defendants quote on page 8 of their brief discussed and rejected an attempt by the EPA to exempt polluters under the so-called "Clean Unit" rule, whereby increases in emissions were

---

[3] EPA forecasted this change in 1991 since, as EPA put it, the "like-kind replacement" test had proven to be an "uncertain indicator" and "highly fact-dependent" test. 56 Fed. Reg. at 27,633, 27,636.

[4] Even applying Defendants' interpretation of "like kind" as equivalent to routine maintenance—a change that involves no change in "design, functionality, style or size of the changed equipment" should be considered "like-kind" or routine (Resp. at 20)—Defendants' own facts demonstrate that some, if not all, of the projects identified by Defendants were not "like kind" because they changed the type of metal that the component was made of. (*E.g.*, Resp. 3-4 ¶ 6 (prior to change tubes were made of three different alloys, whereas after change the tubes were all made of the same metal)).

4

ignored as long as the plant's permit limits were not increased. *New York*, 413 F.3d at 38-39. This is sometimes called the "potential-to-potential" test because it relied only on permit limits and not what the plant emitted prior to a project nor what the plant is projected to emit after the project. *Id*. at 40. That was a different issue than the actual-to-potential test in this case, which uses a plant's pre-change "baseline" emissions from the prior two years, § 52.21(b)(21)(ii), and compares them to an estimate of future emissions under one of two tests as set forth above. The relevant part of the *New York* decision, which Defendants ignore, is the court's description of EPA's interpretation of the PSD regulations as requiring the actual-to-potential test. *Id*. at 15.

Defendants' reliance on the Seventh Circuit's decision in *WEPCO v. Reilly*, 893 F.2d 901 (7th Cir. 1990), is also misplaced. (*See* Resp. Br. at 9, 11, 14, 18.) In *WEPCO*, the company argued that the phrase "begun normal operations" in the 1980 version of 40 C.F.R. § 52.21(b)(21)(iv) could only apply to new units, whereas EPA argued that it applied to existing units too. 893 F.2d at 917. The court held that EPA *could* apply that subsection and the actual-to-potential test to modified units *if* it undertook a rulemaking, *id*. at 918, but that the regulatory history and rationale provided by EPA *as of 1990* did not support application of the actual-to-potential test to what the court termed "like kind" projects. *Id*. at 917-18. The *WEPCO* decision is neither binding on this Court, nor persuasive because it was based on the regulatory history and facts in that case, and EPA subsequently modified the relevant regulations and administrative record specifically to address the decision.[5] Although Defendants do not like the result of that 1992 rulemaking, that does not mean they can ignore the choices EPA made in it. The "begun normal operations" phrase no longer dictates emission-increase test selection.

---

[5] Because the *WEPCO* court could not review the regulations themselves, *see U.S. v. Cinergy Corp.*, 458 F.3d 705, 707-08 (7th Cir. 2006), the *WEPCO* decision is limited to a review of EPA's application of the pre-1992 rules and administrative basis for them to the facts of that case.

### III. EVEN IF THE PHRASE "BEGUN NORMAL OPERATIONS" APPLIED, EPA'S DEFINITION AND NOT DEFENDANTS', CONTROLS.

Defendants argue that the phrase "begun normal operations" in Subsection (iv) controls and that a plant that undergoes "like-kind replacements" should be deemed to have "begun normal operations" even in its modified state. (Resp. at 10-11.) Defendants argue that their modifications were like-kind and thus had already "begun normal operations" (even in their post-project modified state). Even assuming, *arguendo*, that the "begun normal operations" analysis continued after EPA's 1992 rule, Defendants' attempt to define "begun normal operations" in Subsection (iv) is wrong.

EPA's interpretation of "begun normal operations" in EPA's own regulation is controlling. *Udall v. Tallman*, 380 U.S. 1, 16-17 (1965). EPA interprets its own regulation as providing that a plant that undergoes a physical or operational change has only begun normal operations in its changed condition if the change qualifies for one of the exemptions in § 52.21(b)(2)(iii). As EPA noted:

> [T]he actual-to-potential methodology [is] applicable when the source has "not begun normal operations." This approach applies to all changes at major sources <u>that are not otherwise excluded from being considered a physical or operational change, such as routine maintenance, repair, and replacement</u>.

63 Fed. Reg. 39,857, 39,859 n.4 (July 24, 1998) (emphasis added); *see also In re Monroe Elec. Gen. Plant*, EPA Order at 15 n.15 ("For units that have not 'begun normal operations,' the regulations generally provide that actual emissions are equal to the units' 'potential to emit.' EPA interprets this provision to mean that units which have undertaken a non-routine physical or operational change have not 'begun normal operations' within the meaning of the PSD regulations, since pre-change emissions may not be indicative of how the units will be operated

6

following the non-routine change." (internal citations omitted)) (attached as Appx. H)[6]; Detroit Edison Letter (Doc. 43-6) at 18 (same). Therefore, even if the Court were to agree with Defendants that the phrase "begun normal operations" in Subsection (iv) still dictates the emission-increase test, the Court must apply EPA's meaning of that phrase and not the Defendants'. *See Udall*, 380 U.S. at 16-17. Under EPA's interpretation, if a modification qualifies for one of the exemptions in 40 C.F.R. § 52.21(b)(2)(iii), a test other than "actual-to-potential" can apply. However, if it does not, the actual-to-potential test applies.

### IV. DEFENDANTS' ARGUMENT THAT THEY SHOULD GET THE BENEFIT OF THE ACTUAL-TO-PROJECTED-ACTUAL TEST DESPITE NOT MEETING THE TWO EXPLICIT CRITERIA FOR THAT TEST WOULD UNDERMINE AND OVERTURN EPA'S RULEMAKING.

Defendants admit the relevant facts: that Units 3 and 4 are not EUSGUs, and that Defendants failed to comply with post-project reporting required by Subsection (v). Generating units that are not EUSGUs do not meet the conditions in Subsection (v) for using the actual-to-projected-actual test. 67 Fed. Reg. 80,186, 80,188 (Dec. 31, 2002) (stating that the "*WEPCO* Rule" applied only to EUSGUs, and all other sources remained subject to the actual-to-potential test for determining an emission increase); 63 Fed. Reg. at 39,859 & n.4 (rejecting the argument that non-EUSGUs can use anything other than the actual-to-potential test); 57 Fed. Reg. at 32,332-33 ("the regulatory provisions promulgated today are limited to electric utility steam generating units."); *New York*, 413 F.3d at 16 ("Applying the actual-to-projected-actual test and the demand growth exclusion to utilities only, EPA left the actual-to-potential test in place for other sources."); Ltr. from Robert Miller, USEPA, to Steven Dunn (Nov. 5, 2003) (explaining that the only exception to the actual-to-potential test is the 1992 "WEPCO test" rulemaking, but that "the unit in question is not an electric utility steam generating unit, and would therefore not

---

[6] Available at http://www.epa.gov/region7/air/title5/petitiondb/petitions/entergy_decision1999.pdf

be eligible for the WEPCO test.") (attached as Appendix I)[7]. Similarly, EUSGUs that do not comply with post-project reporting do not meet the conditions in Subsection (v) for using the actual-to-projected-actual test. *New York*, 413 F.3d at 34 (describing EPA's 1992 rule as requiring "utilities whose projections included no significant emissions increase" from a modification "to supply permitting authorities with a minimum of five years of data to verify the projections' accuracy").

Nevertheless, Defendants make a plea that the actual-to-projected-actual test *should* apply to them even though two of the units are not EUSGUs and none of the units complied with post-project reporting. (*E.g.*, Resp. at 14-18). Defendants' arguments amount to an inappropriate challenge to policy choices made by EPA in its 1992 rulemaking. This litigation is neither the time nor the place to raise such disputes. *See* 42 U.S.C. § 7607(b)(2) ("Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."); *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 581 (2007) (holding that a court cannot interpret a regulation in a way that constitutes an "implicit invalidation" of EPA's prior decision during rulemaking); *Puerto Rican Cement Co. v. EPA*, 889 F.2d 292, 299-300 (1st Cir. 1989) (challenge to the actual-to-potential test only available by petition to D.C. Circuit within 60 days).

Defendants' argument that the Court should apply the actual-to-projected-actual test from Subsection (v) without regard to the two conditions EPA created in that section (neither of which are met by Defendants) cannot be countenanced. Plaintiff's motion should be granted.

---

[7] Available at http://www.epa.gov/region7/air/nsr/nsrmemos/20030129.pdf

## V. THE FACT THAT EPA HAS NOT ALWAYS USED THE ACTUAL-TO-POTENTIAL TEST IN ITS ENFORCEMENT ACTIONS DOES NOT MEAN IT CANNOT BE USED.

Defendants also imply that because EPA has not *always* used the actual-to-potential test in its enforcement actions, it must not interpret the regulations to allow the use of this test. (Resp. 12-13, 16-17.) This argument is belied by EPA's statements and actions.

First, EPA has consistently applied the actual-to-potential test for non-EUSGU emission sources. *New York*, 413 F.3d at 15 (explaining that EPA determines that an increase occurs for non-EUSGUs "if, after netting, a source's past annual emissions (typically measured by averaging out the two 'baseline' years prior to the change) are less than future annual emissions (measured by calculating the source's *potential to emit* after the change)." (emphasis added)); Detroit Edison Letter (Doc. 43-6) at 18 ("For units that are not 'electric utility steam generating units… the post-change emissions 'shall equal the *potential to emit of the unit*,'…" (emphasis added)); Cyprus Northshore Letter (Doc. 43-7) at 3; Van der Vaart Letter (Doc. 43-8) at 2. Defendants point to nothing contrary.

For EUSGUs, EPA has sometimes exercised its enforcement discretion to allow use of the actual-to-projected-actual test. When it has, EPA has expressly stated that its choice was not due to concerns about the validity of the actual-to-potential test, but for undisclosed case-specific reasons. *See U.S. v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 640 n.16 (M.D.N.C. 2003) ("EPA elected not to seek application of [the actual-to-potential] test, although it did so not based on the validity of its position but for other considerations unknown to the court."). Moreover, Defendants point to no law saying that EPA's occasional choice (for undisclosed reasons) to pursue enforcement cases with the more-favorable-to-defendants actual-to-projected-actual test creates a rule that all plaintiffs must always agree to the same test.

9

## VI. DEFENDANTS HAVE THE BURDEN TO PROVE THEIR DEFENSE.

Defendants want to use the RMRR exemption to avoid liability for their unpermitted plant modifications. As explained in Plaintiff's initial brief, the overwhelming weight of case law shows that it is Defendants' burden to prove that they qualify for that exemption. (Pls. Br. 9-10.) The one decision Defendants cite in opposition was recently vacated and substituted with a decision consistent with Plaintiff's argument. *See* Resp. at 23-24, *citing U.S. v. Duke Energy*, 278 F.Supp.2d 619, 639 (M.D.N.C. 2003), *vacated in part*, No. 1:00CV1262, 2010 U.S.Dist.LEXIS 77,956, *23-24 (M.D.N.C. July 28, 2010) (vacating the prior decision because "[n]othing in the statute, regulations, or legislative history provides an adequate reason for departing from the general rule widely applied by the Supreme Court… that the party seeking the exception bears the burden of proof."). This Court should similarly reject Defendants' arguments.

## VII. CONCLUSION.

For the foregoing reasons, the Court should grant Plaintiff's motion.

        MCGILLIVRAY WESTERBERG & BENDER LLC
          /s/ David C. Bender_____
        David C. Bender
        Christa O. Westerberg
        305 S. Paterson Street
        Madison, WI 53703
        Tel. 608.310.3560

        CULLEN WESTON PINES & BACH LLP
        Lester A. Pines
        Kira E. Loehr
        122 West Washington Avenue, Suite 900
        Madison, WI 53703
        Telephone: (608) 251-0101