`IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-1183 |
| | ) | |
| CITY OF HOLLAND and HOLLAND BOARD OF PUBLIC WORKS, | ) ) | Hon. Paul L. Maloney |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PHYSICAL AND OPERATIONAL CHANGES AT THE DE YOUNG PLANT: SNOWMELT SYSTEM AND DILUTION PIPELINE INSTALLATION**

McGILLIVRAY WESTERBERG & BENDER LLC
David C. Bender
Christa O. Westerberg
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
bender@mwbattorneys.com
westerberg@mwbattorneys.com


CULLEN WESTON PINES & BACH LLP
Lester A. Pines
122 West Washington Avenue, Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:   (608) 251-2883
pines@cwpb.com

I.  **INTRODUCTION.**

Plaintiff's Second Motion seeks a finding and partial judgment that the Snowmelt and the Dilution Pipeline projects were "major modifications" under the Clean Air Act Prevention of Significant Deterioration ("PSD") program.  Dkt. # 91 (Pl's Br. in Supp.) at 1.[1]  The elements for such a finding are that (1) the Defendants made a physical change or change in the method of operation (or both) of the De Young power plant; (2) that the change is not subject to an affirmative defense or exemption, such as "routine maintenance, repair and replacement"; and (3) that the change resulted in a significant net emissions increase of one or more pollutants.  Dkt. # 91 at 10-12; *see also* 42 U.S.C. §§ 7475(a), 7479(2)(C).

Here, Defendants dispute only one of Plaintiff's Statement of Material Facts: paragraph 2 of 58.  Dkt. # 95 (Def's Br. in Opp.) at 2-11.[2]  Additionally, Defendants take issue with only inconsequential portions of Statement of Material Fact 2.  *See* Dkt. # 95 (Def's Br. in Opp.), at 2 (contending that *in addition to boilers*, the plant contains additional equipment).  Therefore, the Court should enter an order finding these facts established in this case.  Fed. R. Civ. P. 56(g).  Additionally, because the Defendants' arguments against summary judgment involve only erroneous and inadmissible legal conclusions, summary judgment in Plaintiff's favor is appropriate.  Fed. R. Civ. P. 56(a).

---

[1] Plaintiff Sierra Club filed its Second Motion for Partial Summary Judgment related to two projects (Snowmelt and Dilution Pipeline) on November 26, 2010.  Dkt. # 89.  The Court extended the Defendants' time to respond and Defendants filed both an Opposition to Plaintiff's Second Motion For Partial Summary Judgment and a Cross-Motion for Partial Summary Judgment on January 18, 2011.  Dkt. ## 93, 94, 95.  The Defendants filed one brief constituting both its Opposition to Plaintiff's Motion and its brief in support of Defendants' Cross-Motion.  (Dkt. # 95.)  Pursuant to the Court's January 26, 2011, Order, Plaintiff is submitting this Reply in Support of Plaintiff's Second Motion for Partial Summary Judgment.  Plaintiff will separately submit its Response in Opposition to Defendants' Cross-Motion for Partial Summary Judgment on or before March 1, 2011.  *See* Dkt. # 98 at 1 ¶ (b).

[2] Defendants purport to contest Plaintiff's proposed findings ¶¶ 19-23, however, they do not, and cannot, provide an evidentiary basis to show that the findings are in dispute and do not, and cannot, object on the grounds that the evidence is not admissible per Rule 56(c) (Dec. 2010).  Rather, they introduce irrelevant and immaterial additional proposed findings of fact, dkt. # 95, at 3, ¶¶ 6-8, that have no application to the actual-to-potential test.  Plaintiff's proposed findings ¶¶ 19 to 23 are therefore not in dispute.  To the extent Defendants' additional proposed facts relate to Defendants' cross motion, Plaintiff will respond to them with Plaintiff's response filed later.

Defendants raise two arguments in opposition to summary judgment:

(1) That the actual-to-projected actual test, rather than the actual-to-potential test, is the appropriate test to measure the emission increases; and

(2) That in addition to showing an emission increase based on the actual-to-potential test, the PSD program contains an additional element of proof of "causation" of an emission increase.[3]

Neither argument has merit. Summary judgment in favor of Plaintiff is appropriate.

## II. THE ACTUAL-TO-POTENTIAL TEST IS THE APPROPRIATE TEST FOR CALCULATING EMISSION INCREASES.

Defendants argue that the "actual-to-projected actual test" applies to "units where 'normal operations' have begun," and that such test applies to the projects here. Dkt. # 95 (Def's Br. in Opp.), at 7 and n.1.[4] Defendants' argument lacks any legal support by caselaw or authoritative agency decisions. Nor it is supported by applicable regulations—which do not contain such a test. Instead, Defendants' attempt to avoid liability for their unpermitted projects by applying an "actual-to-projected" test that appears nowhere in the statute or regulations is the inadmissible testimony by Defendants' paid consultant on what the law should be—which conflicts with caselaw, regulations, and controlling U.S. Environmental Protection Agency ("EPA") interpretations.

### A. Defendants' Argument That The Clean Air Act Supports Their "Projected" Test Is Without Merit.

---

[3] Defendants' Cross-Motion also raises the following collateral issues that will be addressed in Plaintiff's Opposition filed on or before March 1, 2011: (1) whether the physical changes to the De Young plant are changes to the boiler "emission unit" for purposes of determining if BACT limits apply to the boilers; (2) whether the changes to the plant constitute changes in the method of operation for the boilers for purposes of determining if BACT limits apply to the boilers; (3) whether sufficient notice of Plaintiff's claims were provided; and (4) whether any of Plaintiff's claims are time-barred. *See* Dkt. # 94.

[4] Defendants also imply that it was improper to reference arguments made in Plaintiff's First Motion for Partial Summary Judgment because that motion was directed at projects after July 21, 1992. Dkt.. # 95 (Defs' Br. in Opp.), at 7. First, Defendants misunderstand Plaintiff's brief. Plaintiff's Second Motion is based on its own supportive brief, which merely references the summary of the law provided in prior briefing for the Court's convenience. The Second Motion is directed at one project (the snowmelt system) not covered by the First Motion, but the legal analysis of the actual-to-potential test remains the same for that project as well. Second, Defendants' assertion that the earlier argument has no bearing on the snowmelt project is undermined by Defendants' own reference and reliance on its prior brief. *See* Dkt.. # 95 (Defs' Br. in Opp.), at 7 and n.1 (citing Holland's Opposition Brief to the First Motion).

Contrary to Defendants' unsupported assertion that the Clean Air Act requires their preferred "projected" method for predicting emission increases from projects at the James De Young plant (dkt. # 95, at 7), the Act merely defines a modification as any change that increases emissions. 42 U.S.C. § 7411(a)(4), 7479(2)(c). The statute leaves it to U.S. EPA to define the methodology. *New York v. EPA,* 413 F.3d 3, 22 (D.C. Cir. 2005) (holding that the CAA's definition of "modification" does not direct EPA "how to calculate… 'increases' in emissions") ("*New York I*"); *see also generally Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007). EPA has defined the methodology through its regulations and guidance documents, described below, which provide that the actual-to-potential test is the only appropriate test in this case.

### B. EPA's Regulations And Interpretations Require The Actual-to-Potential Test For The Projects At Issue Here.

There is no merit to Defendants' assertion that the "plain language" of the regulations support Defendants' "projected" test. Dkt. # 95, at 7. To the contrary, both the plain language of the regulations and EPA's authoritative interpretation of its own regulation are exactly the opposite of Defendants' interpretation. EPA's 1980 PSD regulations defined an emission increase, for purposes of determining when PSD applies to changes at existing sources, by comparing the "actual emissions," before and after the project. 40 C.F.R. § 52.21(b)(3)(i)(a)(1980-2002); 45 Fed. Reg. 52,676, 52,735 (Aug. 6, 1980). "Actual emissions," in turn, is a specifically defined for the pre-change period as the average rate (in tons per year) during the 24 months preceding the change. 40 C.F.R. § 52.21(b)(21)(ii) (1980-2003). "Actual emissions" is defined for the post-change period as either the "potential to emit" or the "allowable emissions." 40 C.F.R. § 52.21(b)(21)(iii) and (iv) (1980-2003). No other options are provided. Specifically, Defendants' "projected" test is not even in the regulation.

The two options in the "actual emissions" definition for post-project emissions invoke a simple assumption, or proxy, that the facility will emit up to its enforceable permit limits and

3

physical capability.  63 Fed. Reg. at 39,858; 57 Fed. Reg. 32,314, 32,317 (col. 1) (July 21, 1992) ("… EPA regulations recognize that future actual emissions are difficult to predict and employ future 'potential' emissions as a proxy."); 56 Fed. Reg. 27,630, 27,633 (June 14, 1991) (explaining that the use of potential emissions is appropriate as a proxy because the pollution source's future emissions are "difficult to predict"); 45 Fed. Reg. at 52,677 ("the source owner must quantify the amount of the proposed emissions increase.  *This amount will generally be the potential to emit of the new or modified unit*." (emphasis added)); *New York I*, 415 F.3d at 15 ("According to EPA… an increase occurs under the 1980 regulations if… a source's past annual emissions… are less than future annual emissions (measured by calculating the source's potential to emit after the change).").[5]  In other words, the regulations establish the actual-to-potential test as a conservative projection of future emissions since other projection methods are problematic and based on inherently spurious predictions such as the economy, fuel quality, economic competition, performance of other facilities, and the weather.  For example, if a facility makes a change and increases its emissions, those increases could be hidden or exaggerated by contemporaneous emission changes from economic conditions, extreme weather, changes in fuel quality or prices, or myriad other factors.  The D.C. Circuit recognized the inherent problems with Defendants' "projected" methodology and rejected its use unless paired with mandatory minimum recordkeeping and reporting requirements by the pollution source to ensure emissions are not increasing as a result of a major modification.  *New York I*, 413 F.3d at 35 (rejecting EPA's attempt to extend the actual-to-projected-actual test in 2003 to plants that did not meet minimum necessary monitoring, recordkeeping, and reporting obligations); *see also WEPCO v. Reilly,* 893 F.2d 901,

---

[5] "Allowable emissions" in 40 C.F.R. § 52.21(b)(21)(iii) is equivalent to "potential to emit" for purposes of calculating emissions.  *See* Dkt # 43 (Pls. Br. in Supp. of 1st Mot. Sum. J.), at 11 n.10.

917 (7th Cir. 1990) ("EPA can not reasonably rely on a utility's own unenforceable estimates of its annual emissions…").[6]

### B. Caselaw Recognizes The Appropriateness of the Actual-to-Potential Test.

Defendants make oblique reference to "the WEPCO decision as well as numerous other court decisions and EPA enforcement actions" and imply that caselaw applies their "projected" test instead of the actual-to-potential test. Dkt. # 95 (Def. Br. in Opp.), at 7. However, they identify no such caselaw and, in fact, the caselaw that exists is contrary to Defendants' arguments. The only courts to directly address the appropriate test for measuring emission increases—and especially those applying the test to pollution sources other than power plant units larger than 25 MW—have recognized the appropriate use of the actual-to-potential test. *Puerto Rican Cement Co. Inc. v. EPA*, 889 F.2d 292, 296-99 (1st Cir. 1989) ("EPA's application of its [actual-to-potential] regulation to the facts of this case complies with the expressed intent of the regulation's writers."); *Sierra Club v. Morgan*, Case No. 07-C-251-S, 2007 U.S. Dist. LEXIS 82760, *51-56 (W.D. Wis. Nov. 7, 2007); *U.S. v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1102-1106 (W.D. Wis. 2001); *U.S. v. Westvaco Corp.*, Civil Action No. MJG-00-2602, 2010 U.S. Dist. LEXIS 113333, *13-14 (D.Md., Sept. 1, 2010).

### C. U.S. EPA's Controlling Interpretation Of Its Own Regulations Controls The Application Of The Actual-To-Potential Test Under the Facts In This Case.

According to U.S. EPA's interpretations of its own regulations after the 1990 *WEPCO* decision, when the post-project conditions of the facility (including its new parts or new operations) are sufficiently different than pre-project conditions that the post-project conditions have not "begun normal operations" at the time the change occurs—i.e., when the actual-to-potential test

---

[6] U.S. EPA adopted an equivalent to Defendants' "projected" methodology as the "actual-to-representative actual" method in 1992, but did not apply it to power plants under 25 MW or to power plants that fail to comply with the reporting and recordkeeping provisions in the rule. *See* Dkt. # 43 (Pls. Br. in Supp. 1st Mot. Sum. J.), at 16-22; Detroit Edison Letter, Dkt. # 43-6, at 19. As such, it does not apply to Defendants' projects at issue in this case.

5

applies. Specifically, EPA has determined that any change to a plant is sufficiently different unless it falls into one of the limited exemptions from the definition of "major modification" in 40 C.F.R. § 52.21(b)(2) (such as routine maintenance). 63 Fed. Reg. 39,857, 39,858 (July 24, 1998) ("changes… that are non-routine or not subject to one of the other major source [PSD] exemptions are deemed to be of such significance that pre-change emissions for the affected units should not be relied on in projecting post-change emissions.") (attached as Appx. A); *In re Monroe Elec. Gen. Plant*, Petition No. 6-99-2, Order at 15, n. 15 (EPA Adm'r, June 11, 1999) (same) granted in part at 64 Fed. Reg. 44009 (Aug. 12, 1999) (attached as Appx. B); Detroit Edison Letter, Dkt. # 43-6, at 18 n.14. The inquiry is not whether the facility has ever operated prior to the change; the relevant question is whether it has begun to operate in its *newly-changed* condition. Put another way, EPA's controlling interpretation is that where a non-exempt change occurs, the post-change "normal" is different than the pre-change "normal," and therefore "normal" operations of the changed facility have not yet "begun." *Id*. Thus, changes that do not qualify as "routine maintenance," or any of the categorical exemptions in § 52.21(b)(2), have not "begun normal operations" in their post-project state and the actual-to-potential test applies.

U.S. EPA has long applied the actual-to-potential test to such changes. *See Cyprus Northshore*, Dkt. # 43-7, at 3 ("the regulations require EPA to compare the source's actual emissions before the change and its potential emissions after the change"); Dkt. # 43-8 at 2 ("the change in actual emissions is the difference between past actual emissions in tons per year and future potential/allowable emissions in tons per year."). EPA's interpretation of its own regulation is controlling. *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 397 (2008) ("Just as we defer to an agency's reasonable interpretations of the statute when it issues regulations in the first instance… the agency is entitled to further deference when it adopts a reasonable interpretation of regulations it has put in force" (internal citation omitted)); *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding

that an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." (internal quotation omitted)); *Medical Rehabilitation Servs., P.C. v. Shalala*, 17 F.3d 828, 831 (6th Cir. 1994) ("Great deference is generally owed to an agency's interpretation of its own regulations."). EPA's interpretation when to apply the actual-to-potential test is controlling here.

### D. The Snowmelt And Dilution Pipeline Projects Do Not Meet The Conditions Under Caselaw Or EPA Controlling Interpretations For Applying A Test Other Than The Actual-To-Potential Test.

The only appropriate tests for the projects at issue in this case, and the only tests that existed in the regulations prior to 1992, are the actual-to-potential or actual-to-allowable tests described above. Thus, for the 1988 snowmelt pipeline project actual-to-potential is the only test. The actual-to-representative-actual test, which Defendants call the "projected" test, only applies after 1992 and does not apply to any of the projects in this case, as explained in detail in Plaintiff's First Motion for Partial Summary Judgment (Dkt. # 43), because Units 3 and 4 have a capacity smaller than 25 MW, and Defendants did not submit "information demonstrating that the physical or operational change did not result in an emissions increase" to the EPA. 40 C.F.R. § 52.21(b)(21)(v)(1992-2003). Thus, changes made to plants after the effective date of that rulemaking (July 21, 1992) —such as the Dilution pipeline project at issue here—cannot use the "projected" test. Dkt. # 43 at 20-22.[7]

EPA guidance provides that there is no "like-kind" replacement exemption to the actual-to-potential test that is distinct from those enumerated exemptions discussed above (i.e., routine maintenance). *See e.g.* 63 Fed. Reg. 39,857, 39,858 (July 24, 1998). Some courts have nevertheless applied a "like-kind" test, or some equivalent, to determine if the actual-to-potential test applies.

---

[7] If Defendants disagreed with EPA's 1992 decision to apply the actual-to-projected-actual test to Unit 4 and to require plants electing to use the "representative actual" test instead of the actual-to-potential test to submit reporting, Defendants' remedy was through a challenge to the rule under 42 U.S.C. § 7607; a collateral attack on EPA's decision in this case is barred. 42 U.S.C. § 7607(b)(2); *Puerto Rican Cement*, 889 F.2d at 299 (challenge to the actual-to-potential test only available by petition to D.C. Circuit within 60 days).

7

W*EPCO v. Reilly*, 893 F.2d at 908; *U.S. v. Westvaco Corp.*, 2010 U.S. Dist. LEXIS 113333 at *13-14; *Sierra Club v. Morgan*, 2007 U.S. Dist. LEXIS 82760 at *7, *54-56; *Murphy Oil*, 143 F. Supp. 2d at 1105. However, even assuming *arguendo,* that an exception from the actual-to-potential test applies for "like-kind replacements," the Snowmelt and Dilution pipeline projects at issue here are neither "like-kind," nor "replacements."

A "like-kind" replacement is one that does not alter the "design" or the "nature" of the facility or component being replaced. 56 Fed. Reg. 27,630, 27,633/2 (June 14, 1991); *WEPCO*, 893 F.2d at 908; *Sierra Club*, 2007 U.S. Dist. LEXIS 82760, *55-*56 (finding that the actual-to-potential test applied to projects that changed the "design," "style," "size," or the "effectiveness" of a boiler component); *U.S. v. Murphy Oil USA*, 143 F.Supp.2d 1054, 1103-04 (W.D. Wis. 2001) ("replacing … without changing the original design of the systems."). Instead, it merely swaps out a part with an identical one to "merely allow[] the facility to operate again as it had before the specific equipment deteriorated." *Id*. The projects here added <u>new</u> equipment that did not previously exist. *See* Dkt. # 91 (Pl's Br. in Supp), at 3-4, ¶¶ 6-10 and 7-8, ¶¶ 40-44. Therefore, it is clear that the projects at issue here are not "like-kind replacements," and there is no basis on which to apply any other than the actual-to-potential test.

### III. DEFENDANTS MISREPRESENT THE "CAUSATION" FACTOR.

Defendants reference the statute and EPA's implementing regulation and suggest that a claim for making a major modification to the De Young plant requires proof that a project at the plant "caused" an emission increase. But this misrepresents the actual language of the statute and regulation as well as how the PSD program operates. The word "cause" appears nowhere in the statute or in the regulation. Rather, the regulations define a major modification as any physical change that "would result in" a significant net emission increase. 40 C.F.R. § 52.21(b)(2)(i). It is phrased in the future tense and is based on a prediction.

Defendants' use of "causation" is illogical in the context of the PSD program, which is a <u>pre</u>-construction requirement.  The Act clearly requires that facilities to determine if PSD applies prior to undertaking a physical change—which requires an assumption of future emissions, rather than an after-the-fact inquiry into the cause of an experienced increase.  *Ohio Edison*, 276 F. Supp. 2d at 865 (holding that the Act requires a determination of applicability, including emission increases, before the change occurs); *see also U.S. v. So. Ind. Gas & Elec. Co.*, No. IP99-1692-C-M/F, 2002 WL 1629817 at *3, *10 (S.D. Ind. July 18, 2002) (rejecting arguments that PSD applicability be based on post-project emissions and holding that applicability must be based on pre-project estimates); *Ohio Edison Co.,* 276 F. Supp. 2d at 865 *("[E]ven though actual data exists* as to the emissions resulting from the eleven projects, *the law does not permit an after-the-fact analysis of the effect of a plant modification,* which otherwise was required by law to obtain a pre-construction permit." (emphasis added)).  Causation, as Defendants use the term, is inevitably a backward looking inquiry.

As set forth above, the available options for post-project emissions ("potential to emit" and "allowable emissions") both constitute a projection of future emissions.  Defendants' "projection" method also projects future emissions, but based on different assumptions.  Neither methodology contains an after-the-fact analysis of causation—nor can one be squared with the plain meaning of the Act.  Instead, the actual-to-potential and actual-to-allowable tests properly assess whether a project will result in an increase before construction begins.

**IV.   DEFENDANTS' RELIANCE ON "EXPERT" TESTIMONY TO ESTABLISH THE LAW IS IMPROPER.**

Lacking actual support in cases or EPA guidance documents for their "projected" formula for defining post-project "actual emissions," Defendants improperly resort to testimony by a paid consultant "to support the test" they advocate.  *See* Dkt. # 95 (Def's Br. in Opp.) at p. 7.  In addition to setting for the wrong legal standard, the legal conclusions are objectionable as inadmissible

9

testimony. Dkt. # 95 (Def's Proposed Statement of Fact), at 4, ¶¶ 9-11 (citing the Declaration of Defendants' expert, Gary McCutchen, for the legal conclusion that the actual-to-projected actual test applies and that Plaintiff cannot meet the (non-existent) causation element). Plaintiff objects to Defendants' proffered testimony under Fed. R. Civ. P. 56(c)(2) because the testimony cannot be presented as admissible evidence by Defendants. *Ross Bros. Constr. Co. v. MarkWest Hydrocarbon, Inc.*, App. No. 05-6251, 196 Fed. Appx. 412, 415 (6th Cir. 2006) ("This circuit has held that a district judge has discretion—and the duty—to exclude 'legal opinion' it deems improper, and this stands independent of Fed. R. Evid. 704.") (citing *Stoler v. Penn Cent. Transp. Co.*, 583 F.2d 896, 899 (6th Cir. Ohio 1978)); *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir. 1986) (finding that legal opinion testimony is not admissible under Fed. R. Evid. 702 because it cannot assist the trier of fact to understand the evidence or determine a fact in issue); *Hurley v. Deutsche Bank Trust Co., Americas*, Case No. 1:08-CV-361, 2008 U.S. Dist. LEXIS 80526, *10-*11 (W.D. Mich. Sept. 30, 2008) ("[expert's] affidavit will be excluded from the record because it consists almost entirely of improper conclusions of law.") *See also* Plaintiff's Motion to Strike Portions of the McCutchen Declaration, filed herewith. Because Mr. McCutchen's legal opinions are not admissible, Defendant's proposed facts ¶¶ 9-11, and Defendants' argument relying on those facts (dkt. # 95, at 7-8), should be disregarded by the Court in considering Plaintiff's motion. Moreover, because those legal opinions conflict with the actual law, they are irrelevant.

V.     **CONCLUSION.**

For the foregoing reasons, Defendants' opposition to Sierra Club's Second Motion for Partial Summary Judgment is without merit and entry of judgment that the Snowmelt and Dilution pipeline projects were major modifications to the James De Young plant for $SO_2$, $NO_x$, PM and $PM_{10}$.

Dated: February 15, 2011.

        McGILLIVRAY WESTERBERG & BENDER LLC

        /s/ David C. Bender

        David C. Bender
        Christa O. Westerberg
        305 S. Paterson Street
        Madison, WI 53703
        Tel. 608.310.3560
        Fax 608.310.3561
        bender@mwbattorneys.com
        westerberg@mwbattorneys.com


        CULLEN WESTON PINES & BACH LLP
        Lester A. Pines
        122 West Washington Avenue, Suite 900
        Madison, WI 53703
        Telephone: (608) 251-0101
        Facsimile:   (608) 251-2883
        pines@cwpb.com


        *Counsel for Plaintiff*