**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

SIERRA CLUB,                              )
                                          )
                        Plaintiff,        )
                                          )     Case No. 1:08-cv-1183
            v.                            )     Hon. Paul L. Maloney
                                          )
CITY OF HOLLAND and HOLLAND               )
BOARD OF PUBLIC WORKS,                    )
                                          )
                        Defendants.       )
                                          )
                                          \

**RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**


MᴄGɪʟʟɪᴠʀᴀʏ Wᴇsᴛᴇʀʙᴇʀɢ & Bᴇɴᴅᴇʀ LLC
David C. Bender
Christa O. Westerberg
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
bender@mwbattorneys.com
westerberg@mwbattorneys.com


CULLEN WESTON PINES & BACH LLP
Lester A. Pines
122 West Washington Avenue, Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:  (608) 251-2883
    pines@cwpb.com


1

## INTRODUCTION

Defendants' Cross Motion seeks a finding and partial judgment that Plaintiff's claims related to the Snowmelt and the Dilution Pipeline projects should be dismissed. Dkt. # 95. For the reasons that follow, Defendants failed to support their motion with the predicate facts, are wrong on the law, and move to dismiss claims that Plaintiff has not brought in the current case. Denial of Defendants' motion is appropriate. [1]

## SUPPLEMENTAL FACTS AND DISPUTES OF DEFENDANTS' STATEMENT OF FACTS

1.      De Young Unit 3 has to operate at full load to be able to operate the Snowmelt System to effectively melt snow. Howard Dep. 92:12-24 (Dkt. # 89-4).

2.      Therefore, it is typical for Unit 3 to operate at full load during the winter months because of the snow melt system. Howard Dep. 93:3-6 (Dkt. # 89-4).

3.      When lower-cost electrical energy is available to HBPW than the power from JDY Unit 3, Unit 3 is taken off-line. Howard Dep. Tr. 94:19-22 (Dkt. # 89-4). However, during the winter months, JDY Unit 3 is not taken off-line when there is lower cost available than that produced by Unit 3 because of the need to operate Unit 3 to operate the snowmelt system. Howard Dep. Tr. 94:24-95 (Dkt. # 89-4); Koster Dep. Tr. 187:19-188:14 (Dkt. #89-3). Instead, during the winter months, the HBPW attempts to keep the JDY Unit 3 online so that the snowmelt system works. Howard Dep. Tr. 97:6-16 (Dkt. # 89-4).

4.      Defendants sell thermal energy in the form of hot water for the Snowmelt System through a different rate than they sell electricity from the De Young plant. Bender Dec. Ex. 1.

5.      During the two years preceding the Snowmelt system construction, Unit 3 did not operate at full load. Fox Dec. ¶¶ 13-14 and Ex. 1.

6.      In fact, for the winters preceding the Snowmelt system, Unit 3 operated at between 60,000 and just over 70,000 million Btu's per month during the winter. Fox Dec. ¶¶ 13-14 and Ex. 1 at 2.

7.      However, after the Snowmelt System, operation of Unit 3 increased in the winter months, compared to the winter months in the years prior to the Snowmelt system. Fox Dec. ¶¶ 13-14 and Exhibit 1 at 1-2.

---

[1] Defendants' Cross-Motion was combined with Defendants' Opposition to Plaintiff's Second Motion for Partial Summary Judgment. Plaintiff's previously filed Reply addressed those arguments made by Defendants that appeared to be responses in opposition, whereas this brief addresses the new arguments that appear to be Defendants' cross-motion.

8.      After the Snowmelt System was installed, Unit 3 averaged well over 80,000 million Btus per month during the winter. Fox Dec. Ex. 1 at 2-4.

9.      Before the dilution pipeline, the operators of the plant had to "back the units off" to avoid exceeding the temperature limit. Howard Dep. 104:18-105:5 (Dkt. # 89-4). As a result, the utility reduced generation of the boilers to meet the permit limit. Id. 106:19-107:2 (Dkt. # 89-4).

10.     Operating the boilers at a reduced rate was the method HBPW used to control the temperature; there was no other method available until the dilution pipeline. Howard Dep. 107:4-8 (Dkt. # 89-4).

11.     The purpose of the Dilution Pipeline was to allow the HBPW to operate the JDY Units 4 and 5 to meet electricity demands, instead of to meet the temperature limit in the plant's permit. Howard Dep. Ex. 16 (Dkt. # 90-4).

### OBJECTIONS TO DEFENDANTS FACTS

Defendants offer several proposed "facts" that are not based on admissible evidence and, therefore, should not be countenanced by the Court in deciding Defendants' cross-motion. Fed. R. Civ. P. 56(c)(2). Specifically, Defendants rely on the Declaration of David Koster for certain proposed "facts," of which Mr. Koster lacks any personal knowledge. Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 602; *Briggs v. Potter*, 463 F.3d 507, 512 (6th Cir. 2006) (declarations must be based on first-hand knowledge or observation). Mr. Koster's Declaration states that the Snowmelt System was not projected to have any effect on electricity generation when it was installed in 1988 and that the Boiler 3 was expected to operate the same amount as it did before the Snowmelt System. Koster Dec. ¶¶ 5-9; *see also* Def. Prop. Fact 4, 6, 8. But Mr. Koster did not work at the Holland Board of Public Works until after the Snowmelt System was installed and, therefore, has no personal knowledge about what was expected at the time. Koster Dec. ¶¶ 1, 3 (did not work at HBPW until 1989, whereas the Snowmelt system was installed in 1988); Koster Dep. 7:20-8:3 (worked only part-time beginning in 1989 and full time beginning in 1992). Therefore, Mr. Koster has not shown that he has any first-hand knowledge of what was expected in 1988 from the installation of the Snowmelt System. Nor was he offered as an expert witness

3

and therefore his Declaration's opinions cannot be relied upon.  Fed. R. Evid. 702; Fed. R. Civ. P. 26(a)(2).

## ARGUMENT

### I.  PLAINTIFF'S PSD CLAIMS ARE TIMELY.

Defendants argue that Plaintiff's claims for civil penalties for Defendants' failure to obtain a PSD permit before modifying the James De Young plant through the Snowmelt and Dilution Pipeline projects are barred by the five-year statute of limitations in 28 U.S.C. § 2462 (Dkt # 95 (Defs' Br.) at 10) and that Plaintiff's claim for declaratory and injunctive relief are time-barred by the concurrent remedy doctrine (*id*. at 14).  Defendants provide no facts in support of these arguments to show when the claims at issue first accrued, nor do Defendants address Plaintiff's claims for Defendants sequential and ongoing failure to obtain and operate under the required permits.  Therefore, Defendants' motion must be denied.  Additionally, even if the statute of limitations had lapsed for penalties, the concurrent remedy doctrine does not apply and, therefore, Plaintiffs can seek declaratory and injunctive relief.

Defendants contend that the general federal statute of limitations applies and prohibits an enforcement action for civil fines and penalties "unless commenced within five years from the date when the claim first accrued."  28 U.S.C. § 2462.  Defendants imply that the claims at issue accrued only once, on the day that Defendants first commenced construction of the Snowmelt and Dilution Pipeline project.  Defendants are wrong on two counts.  First, the claims do not accrue when the projects occurred.  Instead, the discovery rule determines when the claims accrued.  Second, PSD permitting requirements are ongoing, resulting in sequential violations that recur each day until a permit is obtained.

**A.  Defendants Failed To Show That Plaintiff's Claims Accrued More Than Five Years Ago.**

The statute of limitations at issue "begins to run 'not [on] the date on which the wrong that injures the plaintiff occurs, but that date—often the same, but sometimes later—on which the plaintiff discovers he has been injured.'"  *U.S. v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1084 (W.D. Wis. 2001) (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1991)).  Recently, the Western District of Wisconsin reaffirmed the applicability of the discovery rule to citizens' actions seeking civil penalties under the Clean Air Act.  *Sierra Club v. Dairyland Power Coop.*, Case No. 10-cv-303-bbc, 2010 U.S. Dist. LEXIS 112817, *18-*19 (W.D. Wis. Oct. 22, 2010) (attached as Appx. A) (finding that plaintiff's claims were not time-barred even though the defendant had "commenced construction" more than five years before the complaint was filed).  The discovery rule thus ensures that polluters cannot avoid "the costly process of applying for a permit and take their chances of going undetected for five years."  *U.S. v. Nucor Corp.*, CV-95-PT-2275-M, 1997 U.S. Dist LEXIS 22994, *22-23 (N.D. Ala. Oct. 31, 1997), *vacated in part by consent decree*, 2002 U.S. Dist. LEXIS 27933 (N.D. Ala. May 6, 2002).  A polluter could violate the law and "be protected by the statute [of limitations] if courts did not apply the discovery rule."  *Id.*

Here, there are no facts indicating when Plaintiff discovered Defendants' violations and, therefore, when the Plaintiff's claims accrued.  These factual predicates are necessary for Defendants' statute of limitations affirmative defense.  *New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, Inc.*, Case No. 07-CV-5298, 2009 U.S. Dist. LEXIS 91617, *37-38 (E.D. Pa. Sept. 30, 2009) (denying a motion to dismiss where defendant failed to show when plaintiffs learned of the alleged violations); *Pennsylvania v. Allegheny Energy, Inc.*, Case No. 02:05cv885, 2008 U.S. Dist. LEXIS 93800, *9 (W.D. Pa. Nov. 18, 2008) ("[W]e cannot say at

this juncture when the plaintiffs had notice of Allegheny's alleged permit violations.  This presents a factual question that should not be resolved on a motion to dismiss.").[2]  Defendants have not met their burden to show that they are entitled to summary judgment on statute of limitations and Defendants motion should be denied.

**B.  Plaintiff Is Not Time-Barred From Bringing Claims That Are Ongoing In Nature.**

Even if the discovery rule did not apply to Plaintiff's Clean Air Act claims, Defendant is incorrect that its violations are one-time events.  Rather, Defendants have repeatedly violated the Clean Air Act through a discrete (and ongoing) series of violations for their failure to obtain a permit, including during the five years preceding the commencement of this suit.

Defendants' claim that it is undisputed that Plaintiff alleges that Defendants violated the Act by failing to obtain a PSD permit before commencing construction.  *See* Dkt # 95 (Defs' Br.) at 10 (quoting Pl's Br. at 2).  This is misleading.  While Defendants did violate the Clean Air Act by failing to get the requisite permits, they misstate Plaintiff's allegation that Defendants have still not obtained the permits, which is a continuing series of violations of the Act.  Dkt # 91 (Pl's Br.) at 2.  In other words, Defendants falsely imply to the Court that this case involves only a one-time failure to get a permit on the day that the illegal modifications began.  However, the Sixth Circuit has held that a failure to obtain a PSD permit "presents a series of discrete violations rather than a single violation that may or may not be 'continuing' in nature."  *Nat'l Parks Conversation Ass'n, Inc. v. Tenn. Valley Auth.*, 480 F.3d 410, 417 (6th Cir. 2007); *see also id.* at 419.  Thus, the defendant in that case remained in violation of the requirement that it obtain

---

[2] On summary judgment, the *Allegheny Energy* court ultimately rejected application of the discovery rule because the plaintiff was the United States government, but instead applied the equitable tolling rule, which led to the same result.  2008 U.S. Dist. LEXIS 93800 at *15 (denying summary judgment); *see also Pennsylvania v. Allegheny Energy, Inc.*, 2010 U.S. Dist. LEXIS 37818 (W.D. Pa. Apr. 18, 2010).

a PSD permit, a violation that "manifests itself each day the plan[t] operates." *Id.* at 419.

Because the obligation to get a "pre-construction" permit does not evaporate if not acquired the

first day of construction, each day that the source fails to come into compliance by obtaining the

permit is a new, discrete, violation. *Id.* ("the Tennessee SIP's *pre* construction permitting

requirement . . . establishes the duty to obtain a construction permit containing the proper

emissions limits is ongoing, even *post*-construction") (emphasis in the original).

The Sixth Circuit's reasoning is consistent with U.S. EPA's policy and practice for the

PSD program generally and is thus applicable to the federal PSD regulations as well.  The U.S.

EPA has made clear since the PSD program's inception that after-the-fact permits can, and shall,

be issued for sources in violation of the requirement to get a permit:  "Any source which

improperly avoids review and commences construction will be considered in violation of the

applicable SIP and *will be retroactively reviewed under the applicable NSR regulation*."  45 Fed.

Reg. 52,676, 52,725 (Aug. 7, 1980) (emphasis added).  Since the beginning of the PSD program,

EPA has continued to assert that once a source triggers PSD requirements due to construction or

a major modification, it is required to comply with PSD program requirements.   Arnold W.

Reitze, Jr., *State and Federal Command-and-Control Regulation of Emissions from Fossil-Fuel

Electric Power Generating Plants*, 32 Envtl. Law 369, 388 (2002) (describing EPA's position as

"once in, always in").  This is true even when a source undergoes a major modification,

triggering PSD program requirements, but then brings its emissions below "significant" levels

for PSD purposes after the modification.  Memorandum from Eric V. Schaeffer, Director, Office

of Regulatory Enforcement, U.S. EPA, *Guidance on the Appropriate Injunctive Relief for

Violations of Major New Source Review Requirements* at 2 (Nov. 11, 1998).[3]  Therefore, the

---

[3] *Available at* http://www.epa.gov/region07/programs/artd/air/nsr/nsrmemos/nsrguida.pdf.

Sixth Circuit's reasoning in *National Parks* applies equally to Defendants' ongoing violations in this case of the requirement to obtain a permit for the Snowmelt and Dilution Pipeline projects. 480 F.3d at 419 ("this alleged violation manifests itself each day the plan[t] operates. Accordingly, we hold that the violations predating [the date the original complaint was filed] are time-barred, while the remaining violations are not.").

District courts have split on whether and how to apply the five-year statute of limitations to claims seeking civil penalties stemming from failure to obtain a PSD permit, with some allowing the claims,[4] and others finding the claims time-barred.[5]  Three courts of appeal have addressed the issue, also coming to different conclusions.  *Nat'l Parks-6th Cir.*, 480 F.3d 410 (declining to limit statute of limitations to commencement of construction); *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1018 (8th Cir. 2010) (applying statute of limitations to commencement of construction only); *Nat'l Parks and Conservation Assn'n v. Tennessee Valley Authority,* 502 F.3d 1316, 1321 (11th Cir. 2007) (applying statute of limitations to commencement of construction only); *see also United States v. Marine Shale Processors*, 81 F.3d 1329, 1357 (5th Cir. 1996) (rejecting application of statute of limitations defense).

Defendants urge the Court to follow the courts that have found a failure to obtain a permit is a "one-time (not continuing) violation."  Dkt # 95 (Defs' Br), at 18-19.  The district court cases relied on by Defendants focus on the continuing violation doctrine applied to a single

---

[4] *E.g.*, *Sierra Club v. Dairyland Power Coop*, Case No. 10-cv-303-bbc, 2010 U.S. Dist. LEXIS 112817, (W.D. Wis. Oct. 22, 2010); *Sierra Club v. Portland Gen. Elec. Co.*, 663 F. Supp. 2d 983 (D. Ore. 2009); *U.S. v. East Ky. Power Coop., Inc.*, 498 F. Supp. 2d 970 (E.D. Ky. 2007); *U.S. v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 651 (M.D.N.C. 2003), *aff'd on other grounds*, *U.S. v. Duke Energy Corp.*, 411 F.3d 539 (4th Cir. 2005), *vacated by Envt'l. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007); *U.S. v. Ohio Edison Co.*, Case No. 2:99-CV-1181, 2003 U.S. Dist. LEXIS 2357, *19-22 (S.D. Ohio Jan. 17, 2003).

[5] *E.g.*, *U.S. v. Midwest Generation, LLC*, 694 F. Supp. 2d 999 (N.D. Ill. 2010); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003); *U.S. v. Ill. Power Co.*, 245 F. Supp. 2d 951 (S.D. Ill. 2003); *U.S. v. So. Ind. Gas & Elec. Co.*, Case No. IP99-1692-C-M/S, 2002 U.S. Dist. LEXIS 14040 (S.D. Ind. July 26, 2002).

violation.  The continuing violations doctrine applies when a tort involves a continued repeated injury such that the limitation period does not begin until the date of the last injury or when the tortious act ceased.  *Hull v. Cuyahoga Valley Joint Vocational Sch. District Bd. of Ed.*, 926 F.2d 505, 510-11 (6th Cir. 1991) (explaining that the continuing violation doctrine applies where a plaintiff challenges not just one incident of unlawful conduct but an unlawful *practice* that continues into the limitations period.); *Kovacs v. U.S.*, 614 F.3d 666, 676 (7th Cir. 2010) (It is thus a doctrine not about a continuing, but about a cumulative, violation.") (internal quotations omitted).

However, what is at issue here is not a continuing violation of the obligation to obtain a permit on the first day that construction commences, but an ongoing violation of the obligation that attaches and gives rise to a separate violation every day.  "The continuing violation doctrine . . . does not apply to 'a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing'."  *Kovacs*, 614 F.3d at 676 (quoting *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 443 (7th Cir. 2005); *Dairyland*, *44-45; *Sierra Club v. Portland Gen. Elec. Co*, 663 F.Supp.2d 983, 994 (D. Ore. 2009).  Thus where there is an alleged ongoing series of discrete unlawful acts, those acts that occurred within the statute of limitations may be litigated notwithstanding the existence of time-barred unlawful acts.  *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003) (citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Indeed, Defendants cite to *Murphy Oil,* 143 F. Supp.2d at 1083-84, in support of their argument.  Dkt # 95 (Defs' Br.) at 13.  However, just recently, the *Murphy Oil* court reexamined its position and explicitly found that its *Murphy Oil* holding was in error, and now holds that failure to get a construction permit is an ongoing violation.  *Dairyland*, at *31 ("After reviewing

the language in the Clean Air Act, Wisconsin's PSD regulations and the several cases addressing the statute of limitations question and the doctrine of continuing violations since this court decided *Murphy Oil*, 143 F. Supp. 2d at 1083-84, I conclude that *Murphy Oil* was decided incorrectly with respect to this issue. I am persuaded by those cases that have found that violations of the Clean Air Act's PSD requirements constitute a series of discrete infractions occurring at the commencement of construction and continuing until the defendant obtains a permit and comes into compliance with PSD obligations."). In *Dairyland*, the court explained that "even where the statute of limitations applies to a claim for civil penalties, the statute of limitations does not bar violations that are ongoing." *Id.* at *23 (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982)). The district court there correctly concluded that each day that a defendant operates a modified pollution source without a permit is a new and separate violation. *Dairyland*, at *41-*45. In so holding, the court correctly rejected the same argument that Defendants now make in the pending motion: that PSD provisions are solely preconstruction requirements and violations of those requirements cease on the date construction on the major modification is complete.

Thus, unlike the "continuing violation theory," a properly understood PSD permitting violation is actually a series of violations that occur each successive day that a modified pollution source fails to meet the permitting requirements of the PSD program. Consequently, Defendants have not been relieved of their ongoing obligation to get a PSD permit that was first triggered when it modified its boilers and Plaintiff's request for civil penalties for each separate violation of that obligation is not time-barred.[6]

---

[6] Plaintiff agrees that under 28 U.S.C. § 2462, it may only seek penalties for the five years of violations preceding sending of its notice of intent to sue letter. *E.g.*, *Portland Gen.*, 663 F. Supp. 2d at 994.

### C. The language of the PSD statute and regulations applies to operations as well as construction.

Defendants attempt to limit the PSD requirements to preconstruction activities based on a truncated read of the Act's citizen suit provision. Dkt # 95 (Defs' Br.), at 11. Defendants point to CAA § 304(a)(3), which allows citizen suits of against sources that "propose to construct or constructs" without a permit and argue that there is no mention of "operations.". *Id.* Even assuming *arguendo* this crabbed reading of § 304(a)(3) is correct, Defendants fail to discuss the other citizen suit authority provided under section 304*(a)(1)*, which allows citizens to sue a person for violations of "an emission standard or limitation under this chapter" where "emission standard or limitation under this chapter" is defined to include "any requirement to obtain a permit as a conditions of *operations*." 42 U.S.C. § 7604(a)(1), (f)(4) (emphasis added). Relying on this section, the *Dairyland* court reasoned that citizens may bring claims, inter alia, to enforce "any requirement to obtain a permit as a condition of operations." *Dairyland*, at *32 (quoting 42 § U.S.C. § 7604(f)(4)). Thus, "[f]or plaintiff's claims to be timely, then, these violations must . . . constitute a failure to obtain a permit that is required for the operation of defendant's plants." *Id.* Having a PSD permit is an ongoing requirement for anyone who operates a new or modified plant.

The federal PSD program contains provisions that confirm that it is a program intended to apply to and affect ongoing operations, not merely the act of constructing as Defendants would have this Court believe.[7] For example, a change in the method of *operation* is a "modification"

---

[7] The federal PSD regulations were in effect when the snowmelt system and the dilution pipeline system were constructed. The Michigan SIP PSD provisions, now in effect, similarly apply to operations, not just pre-construction activities. *See e.g.,* Rule 201(6) (". . . operation of the process or process equipment is allowed by the permit to install"); Rule 201(6)(b) ("all terms and conditions or the permit to install are incorporated into a renewable operating permit . . .); Rule 201(8) ("If evidence indicates that the process or process equipment is not performing in accordance with the terms and conditions of the permit to install, the department . . . may revoke the permit to install . . . . Upon revocation of the permit to install, operation of the process or process equipment shall be terminated.")

that triggers PSD requirements. 42 U.S.C. § 7411(a)(4) (incorporated into the PSD program at 42 U.S.C. § 7479(2)(c)).  In fact, here Defendants' modified the De Young plant through operational changes following the Snowmelt and Dilution Pipeline projects.  Additionally, the plain language of 42 U.S.C. § 7475(d)(2)(D)(iii) makes clear that the PSD program governs operations of  major sources of pollution.  It says: "In the case of a permit issued pursuant to the PSD program, "such facility shall comply with such emission limitations under such permit[.]" *Id*.  This clearly applies to periods of operation after a modification, not simply to the act of modifying.  Similarly, 42 U.S.C. § 7475(a)(7) requires PSD permittees to "conduct such monitoring as may be necessary to determine the effect which emissions from any such facility may have, or is having, on air quality[.]"  *Dairyland*, at *35.  Clearly, the requirement to monitor the air quality impacts a facility "is having" scotches any argument that PSD does not apply to operations.  In short, the Act's PSD program is not merely a requirement to obtain a piece of paper prior to a construction activity, as a building permit or fishing license might be; it is a regulatory program that attaches ongoing obligations on the operations of a pollution source after a modification. As Judge Crabb described in *Dairyland*,

> The broad purpose of the PSD program and the Clean Air Act also support the maintenance of a citizen suit for a major source's failure to obtain a PSD permit and fulfill other PSD obligations.  When Congress established the PSD program, existing facilities were grandfathered, that is, they were allowed to defer installing emission controls.  But Congress intended that modification of those facilities would trigger the requirement to install and operate such controls so as to reduce emissions. *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) ("Congress did not permanently exempt existing plants from [PSD] requirements"); *Alabama Power Co. v. Castle*, 636 F.2d 323, 400, 204 U.S. App. D.C. 51 (D.C. Cir. 1979) ("The statutory scheme intends to 'grandfather' existing industries; but the provisions concerning modifications indicate that this is not to constitute a perpetual immunity from all standards under the PSD program.") The purpose of the Act's PSD mandate is to control air quality through proper source review and emissions controls, such as best available control technology. 42 U.S.C. § 7470.  It would be difficult to achieve these goals if the failure to obtain

12

> a PSD permit, with proper emission controls, is viewed as a one-time event that
> cannot be enforced at a later time.  *United States v. American Electric Power
> Service Corp.*, 137 F. Supp. 2d 1060, 1066 (S.D. Ohio 2001) (finding it "illogical
> to conclude that a defendant may only be held liable for constructing a facility,
> rather than operating such facility, without complying with the permit
> requirements").

*Dairyland*, at*41-42.  *See also Portland Gen.*, 663 F. Supp. 2d at 993 ("It is difficult to see how

the program could effectively prevent the deterioration of air quality if PSD requirements ceased

upon the completion of construction.  It makes little sense for a PSD permit to set emissions

limitations and require pollution control technology, but not require a facility to operate pursuant

to those restrictions.") *U.S. v. Ohio Edison*, 2:99-CV-1181, 2003 U.S. Dist. LEXIS 2357, *19

(S.D. Ohio Jan. 17, 2003) (identifying monitoring as an operating restriction); *Marine Shale

Processors*, 81 F.3d at 1355-56 ("The CAA statutory scheme contemplates at least two different

types of air permits unhappily named 'preconstruction permits' and 'operating permits,' with

confusion easily resulting from the fact that preconstruction permits often include limits upon a

source's operations.")

The federal PSD regulations similarly encompass post-modification operations.  For

example, modifications include "any physical change in or change in the *method of operation* of

a major stationary source[.]"  40 C.F.R. § 52.21(b)(2).  40 C.F.R. § 52.21(m) is entitled "air

quality analysis" and it requires "post-construction monitoring" to determine the effect emissions

from PSD source "… are having, on air quality in any area."  *See* 40 C.F.R. § 52.21(m)(1) & (2).

Finally, 40 C.F.R. § 51.21(r)(1)(emphasis added) provides:

> Any owner or operator who constructs or **operates** a source or
> modification not in accordance with the application submitted
> pursuant to this section or with the terms of any approval to
> construct, or any owner or operator of a source or modification
> subject to this section who commences construction after the
> effective date of these regulations without applying for and

> receiving approval hereunder, shall be subject to appropriate
> enforcement action.

Therefore, the argument that PSD is solely a preconstruction program, with no impact on operations after a modification, must be rejected.[8]

Plaintiff's request for civil penalties related to Defendants' failure to obtain a PSD permit for the snowmelt system and the pipeline dilution system are timely.

### D.  Plaintiff's Claims For Injunctive Relief Are Not Barred By The "Concurrent Remedy Doctrine."

Plaintiff seeks injunctive relief in addition to civil penalties, as allowed by the CAA, for its PSD-related claims and other claims.  Dkt # 16 (First Amend. Compl), Sixth Claim; 42 U.S.C. §§ 7604(a) and (g).  The statute of limitations only applies to penalties, not to injunctive relief. 28 U.S.C. § 2462. Yet Defendants contend that injunctive relief is nevertheless barred by the statute through the so-called concurrent remedy doctrine.  Because Defendants are incorrect that civil penalties are time-barred, their contingent argument that injunctive relief is also barred fails and need not be addressed by the Court.  *Nat'l Parks-6th Cir.*, 480 F.3d at 419-20 (concluding that since civil penalties were not subject to statute of limitations, the court "need not address" the concurrent remedy rule).  However, even assuming, *arguendo*, that Plaintiff cannot obtain any civil penalties related to the Snowmelt and Dilution Pipeline projects, the concurrent remedy doctrine would not bar Plaintiff's request for injunctive relief.  *Cinergy*, 397 F.Supp. 2d at 1030-32.

---

[8] In fact, prior to 1990, when the Title V program was enacted, PSD permits may have contained the *only* operating requirements for many sources because "[b]efore 1990, no federal law required states to maintain operating permit programs," while the PSD program was created in 1977.  *Marine Shale Processors*, 81F.3d at 1356.  Far from competing with one another, the PSD and Title V permit programs "work in concert," with Title V permits "consolidat[ing] pre-existing requirements (such as those from the PSD program), into a single document." *Portland Gen.*, 663 F. Supp. at 994.

The "concurrent remedy" concept is a judicial creation not found within the explicit language enacted by Congress. Therefore, the Supreme Court's caution against artificially limiting the courts' equity powers applies in full force. *Porter v. Warner Holding Co*., 328 U.S. 395, 398 (1946) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."). Moreover, the fact that the Clean Air Act is a remedial statute, 42 U.S.C. § 7470(1), further cautions against application of non-statutory restrictions on its implementation based on the Supreme Court's "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

1. **The Concurrent Remedy Doctrine Should Not Be Applied Because Civil Penalties and Injunctive Relief Under the Clean Air Act are Both Equitable in Nature.**

Citizen suits do not fit within the traditional caselaw on "concurrent remedies," where a plaintiff's putative equitable claims are actually seeking damages similar to what would have been available to him if his claims at law had not been barred. Punitive penalties are not damages; damages are the premise for the concurrent remedy doctrine. In *Cinergy*, 397 F. Supp. 2d at 1031-32, the court rejected application of the concurrent remedy doctrine to a claim for injunctive relief under the Clean Air Act, recognizing that civil penalties are equitable in nature. "Civil fines collected through a citizen suit must be paid to the United States, not to the citizens; thus 'the primary purpose of civil penalties is deterrence, not reward to the Plaintiffs.'" *Cinergy*, 397 F. Supp. 2d 1032. Similarly, in *United States v. American Electric*, 137 F. Supp. 2d 1060, 1068 (S. D. Ohio 2001), the court concluded that civil penalties paid to the government are not compensation to citizen plaintiff, but rather are equitable in nature due to their deterrent effect.

Accord *Sierra Club v. Dayton Power & Light, Inc.*, Case No. 2:04-CV-9095, 2005 U.S. Dist. LEXIS 42473, *11-12 (S.D. Ohio Aug. 12, 2005); *Commonwealth of Pennsylvania v. Allegheny Energy Serv. Corp.*, Civ. Action No. 05-885, 2006 U.S. Dist. LEXIS 38377 *17 n.3 (W.D. Penn. April 19, 2006). The Supreme Court has also recognized that penalties paid to the U.S. Treasury are not to compensate for injury, as an award of damages at law would be, but coerce a defendant back into compliance with the law, as an alternative or supplement to injunctive relief. *Friends of the Earth v. Laidlaw Environmental Services*, 528 U.S. 167, 174 (2000) ("civil penalties… may serve, as an alternative to an injunction, to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation."). Thus, Defendant's citation to the non-environmental Sixth Circuit case, *Madison v. Wood*, recognizing the concurrent remedy doctrine in a case involving primarily monetary damages is inapposite and not controlling on the facts here. Dkt # 95 (Defs' Br.), at 15 (citing 410 F.2d 564 (6th Cir. 1969)).

Defendants have also cited to two circuit decisions holding that the concurrent remedy doctrine bars suits for injunctive relief under the Clean Air Act when the legal remedy is barred by the statute of limitation. *See Nat'l Parks-11th Cir.*, 502 F.3d at 1327; *Otter Tail*, 615 F.3d at 1018–19. These cases, however, improperly characterize civil penalties as the "legal remedies" premise on which the "concurrent remedy" analysis is based, rather than as a deterrent paid to the government. *A-C Reoganization Trust v. E.I. DuPont de Nemours & Co.,* 968 F. Supp. 423, 429 (E.D.Wis.1997). ("[the concurrent remedy doctrine,] which is meant to bar untimely suits that are really suits at law" was not applicable to environmental citizen suits that "really are equity suits."). This Court should not follow holdings based on the erroneous premise that penalties are legal remedies for the Plaintiff. Instead, it should follow the many district courts allowing injunctive claims to go forward even where claims for penalties were barred. *See e.g.,*

16

*Duke Energy*, 278 F. Supp. 2d at 653 (*citing United States  v. Telluride Co.*, 146 F.3d 1241, 1245 (10th Cir. 1998); *see also id.* at 653 ("[b]y its plain terms, the general federal statute of limitations has no application to injunctive relief," but "pertains only to actions for 'any civil fine, penalty, or forfeiture, pecuniary or otherwise'") (quoting 28 U.S.C. § 2462); *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997); *Reliant*, 2009 U.S. Dist. LEXIS at *32-33; *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 443 n.2 (D.Md. 2001) ("The five-year statute of limitations applies to claims for civil penalties only."); *Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d at 1067-68 ("statutes of limitation historically do not control measures of equitable relief") (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 90 L. Ed. 743, 66 S. Ct. 582 (1946)).

## 2.  Alternatively, the Concurrent Remedy Doctrine Is Inapplicable Where the Plaintiff Is Acting As A Private Attorney General.

Even if this court were to conclude that Sierra Club's claims for penalties paid to the U.S. Treasury are claims "at law" and that the concurrent remedy doctrine could apply, it should not be applied here because Plaintiff is acting as a private attorney general.

 "It is well-established that the concurrent remedy doctrine does not apply to suits brought by the United States in its official enforcement capacity." *Sierra Club v. Duke Energy Ind.*, Case No. 1:08-cv-437-SEB-TAB, 2010 U.S. Dist. LEXIS 97260, *32 n.19 (S. D. Ind. Sept. 14, 2010); *see also Murphy Oil*, 143 F.Supp.2d at 1987 (holding that § 2462 applies only to civil penalties and that "the concurrent remedy rule cannot properly be invoked against the government when it seeks equitable relief in its official enforcement capacity.") (internal quotations omitted).  As the court explained in *Banks,* 115 F.3d at 919 (11th Cir. 1997), "'an action on behalf of the United States in its governmental capacity…is subject to no time limitation, in the absence of congressional enactment clearly imposing it.'"  *See also Telluride*, 146 F.3d at 1249 ("[f]or the same reasons applied in *Banks,* we conclude the concurrent remedy

rule does not bar the Government's claims for equitable relief"); *United States v. Hallmark*, 14 F. Supp. 2d 1069, 1076-77 (N.D. Ill. 1998)  The reasoning behind this line of cases applies equally to citizen suit plaintiffs because environmental citizen suits are indistinguishable in purpose from government suits to enjoin pollution: both serve the public interest, not vindication of private interests.

The concept that plaintiffs act as "private attorneys general" in environmental citizen suit is well established.  For example, in *Bennett v. Spear*, the Supreme Court explained that Congress intended to "encourage" actions by "private attorneys general" to protect the environment, as "evidenced by its elimination of the usual amount-in-controversy and diversity-of-citizenship requirements" as well as its provision for recovery of costs. 520 U.S. 154, 165 (1997); *see also, McEvoy v. IEI Barge Services Inc.*, 622 F.3d 671, 674 (7th Cir. 2010) ("[c]itizen-suit provisions in environmental laws empower individual persons to serve as private attorneys general and to enforce standards set at the federal or state level. The theory is that the efforts of these private parties will supplement governmental enforcement")*; Metro. Wash. Coal. For Clean Air v. Dist. of Columbia*, 511 F. 2d 809, 814 (D.C. Cir. 1975) ("citizens are recruited to serve as private attorneys general to facilitate enforcement of [the CAA] in the face of official inaction").

In light of the public purpose for citizen suits, several cases have held that the concurrent remedy doctrine should be inapplicable to citizen plaintiffs under the Clean Air Act.  In *United States v. American Electric Power*, the court rejected application of the concurrent remedy doctrine to claims for injunctive relief by the United States, as well as by states and a citizen group suing under the citizen suit provisions of the CAA.  136 F. Supp. 2d 808, 811 (S.D. Ohio 2001).  Clean Air Act claims by citizen plaintiffs for injunctive relief were also held not barred

by the concurrent remedy doctrine in *Sierra Club v. Dayton Power & Light.*  2005 U.S. Dist.

LEXIS 42473 at *11-12.  *See also A-C Reorganization*, 968 F. Supp. at 429, n.6 (E.D. Wis.

1997); *see generally Sierra Club v. Chevron U.S.A., Inc.*, 834 F.2d 1517, 1522 (9th Cir. 1987)

(citizens who "stand in the shoes" of the government should not be subject to laches).

      Cases coming to the opposite conclusion were erroneously decided.  *Nat'l Parks-11th Cir.*

was based on the court's unsupported isolation of the phrase "on [their] own behalf" in 42 U.S.C.

§ 7604(a) to suggest citizen suit plaintiffs "do not represent the public at large in the same way

the government does when it brings suit to enforce the statute."  502 F.3d at 1327.  As the

Supreme Court has held, the Clean Air Act's citizen suit provision was "'to afford citizens very

broad opportunities to participate in the effort to prevent and abate air pollution.'"  *Penn. v. Del.*

*Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986) (quoting 1 Leg. Hist., p. 138

(Senate Consideration of the Report of the Conference Committee, Dec. 18, 1970)) (internal

punctuation marks omitted).  "Congress found that 'Government initiative in seeking

enforcement under the [CAA] has been restrained,' and urged the courts to 'recognize that in

bringing legitimate actions under this section citizens would be performing a service . . .'."  *Id.*

(quoting S. Rep. No. 91-1196, at 36, 38).  Individuals or groups that bring citizen suits under

federal environmental statute on behalf of the government "are acting as private attorneys

general and, accordingly, the purpose of such a suit is to protect and advance the public's interest

. . . rather than to promote private interests." *Middlesex County Sewerage Auth. v. Nat'l Sea*

*Clammers Assoc.*, 453 U.S. 1, 16-17, 17 n. 27, and 21 (1981); *see also Conservation Law Found.*

*v. Browner*, 840 F. Supp. 171, 174 (D. Mass. 1993) ("The Congressional purpose in enacting the

Clean Air Act citizen suit provision was to authorize citizens to act as 'private attorneys

general.'").  In short, the citizen suit provision exists precisely to give citizens the power to

represent the public interest in the same way that government enforcement would, not to seek the plaintiff's own pecuniary interests.

For all of these reasons, Defendant's attempt to extinguish Plaintiff's claims to injunctive relief as well as the claims for declaratory relief with the concurrent remedy doctrine is unavailing.

**II.      THE COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS RELATED TO THE SNOWMELT SYSTEM AND DILUTION PIPELINE PROJECTS.**

The Clean Air Act's citizen suit provision provides authority for citizens to bring different types of claims.  Section 7604(a)(1) provides for claims alleging violations of emission standards or limitations, which are defined in § 7604(f).  42 U.S.C. §§ 7604(a)(1), (f).  Section 7604(a)(2) provides for specific claims against the U.S. EPA.  42 U.S.C. § 7604(a)(2).  Section 7604(a)(3) provides for claims against those, like Defendants, who "proposes to construct or constructs any new or modified major emitting facility without a permit required under [the PSD program]. . . ."  Importantly, § 7604(b) requires pre-suit notice, but only for claims for violations under § 7604(a)(1), not for claims under 7604(a)(3).[9]  That section provides:

No action may be commenced—

(1) under subsection (a)(1) of this section—
        (A) prior to 60 days after the plaintiff has given notice of the violation
        (i) to the Administrator,
        (ii) to the State in which the violation occurs, and
        (iii) to any alleged violator of the standard, limitation, or order, or

42 U.S.C. § 7604(b) (emphasis added).  *See also* 40 C.F.R. § 54.3(b).

_____

[9] Notice is also required for claims against EPA under 42 U.S.C. § 7604(a)(2), *see* § 7604(b)(2), but that provision is not at issue in this case.

"By its own terms, the pre-suit notice requirement of 42 U.S.C. § 7604(b) does not apply to citizen suits brought pursuant to 42 U.S.C. § 7604(a)(3)." *Public Citizen v. Southwestern Elec. Power Co.*, Case No. 5:05-cv-39-DF, 2006 U.S. Dist. LEXIS 93336, *9-10 (E.D. Tx. Dec. 27, 2006) (citing *U.S. v. Am. Elec. Power Serv. Corp.*, 137 F.Supp.2d 1060, 1064-65 (S.D. Ohio 2001)); *id*. at *20-21 (holding that the court was not required to determine if notice was sufficient).  Sierra Club's claims brought under 42 U.S.C. § 7604(a)(3) do not require notice. Defendants do not claim otherwise.

Defendants' cross motion for partial summary judgment is limited to the Snowmelt and the Dilution Pipeline projects.  *See* Dkt # 95 (Defs' Br).  Plaintiff brought its claim that the Snowmelt System and the Dilution Pipeline were modifications for which a PSD permit was required under § 7604(a)(3), which requires no notice.  *See* Dkt # 16 (First Amend. Complaint), First Claim.  The current litigation does not include claims for violations of BACT arising from the Snowmelt and Dilution Pipeline projects.[10]   Instead, Plaintiff's claims for violations of BACT limits are premised on other modifications to the De Young plant that triggered BACT limits.  Those other modifications were noticed in Plaintiff's original Notice of Intent (*see* Dkt # 95-4) and are not at issue in this motion.

Defendants' motion based on a lack of notice for the Snowmelt and Dilution Pipeline projects should be denied since no notice is required for failure to obtain a permit pursuant to 42 U.S.C. § 7604(a)(3).

---

[10] Plaintiff served Defendants with a second notice of intent to sue, which included notice of the Snowmelt System and Dilution Pipeline projects failing to comply with BACT.  *See* Dkt # 95-5.  The notice was served more than 60 days ago and, therefore, Plaintiff may seek to amend its complaint or file a new action claiming the two projects triggered BACT requirements that Defendants have violated.  Such future litigation is obviously not at issue in this motion, however.

III.     THE SNOWMELT AND DILUTION PIPELINE PROJECTS RESULTED IN
         CHANGES IN OPERATION OF THE PLANT.

Defendants argue that the Snowmelt and Dilution Pipeline projects did not trigger the

requirement of BACT because the cooling water system—which was altered by both projects—

is not part of the same "emission unit" as the boilers.  Dkt # 95 (Def. Br.) at 22, citing 40 C.F.R.

§ 52.21(j)(3) (1980-2002).  As noted above, Plaintiff's claims for violations of BACT limits are

not premised on the Snowmelt and Dilution pipeline projects.  However, the Snowmelt and

Dilution Pipeline projects were physical changes and changes in operation that required permits

and Plaintiff's claims for failure to obtain the required permits at are issue in this case.  There is

no dispute that the Snowmelt and Dilution Pipeline projects were physical changes to the De

Young plant.  Even assuming, *arguendo*, that they were not physical changes, the boiler

nevertheless underwent a change in method of operation following the projects.

### A.  Using the Boilers For Snowmelt Was a Change In Method of Operation

Regardless of whether the Snowmelt System was a physical change to the "emission

unit" that contains the boilers (it was, as explained above), the Snowmelt System resulted in a

change in method of operation for the De Young Unit 3 boiler.  As noted in Sierra Club's

opening brief, all types and degrees of operational changes are covered by the PSD regulation.

Dkt. # 91 at 13.  Here, the Defendants were operating boiler 3 prior to the Snowmelt System to

produce only steam, which was used to create electricity for sale into only one market: electrical

utility customers, whereas after the Snowmelt System, Defendants operated the boiler as a

cogeneration unit to not only produce steam-generated electricity, but also to produce a new

product: hot water, which is sold to new and wholly separate market.  Pls. Supplemental

Proposed Findings of Fact ("PSPFOF") ¶¶ 1-4; *see also* Koster Dep. 186:25-187:18 (Dkt. # 89-

3) (City pays a specific hot water utility rate for hot water provided by the Board of Public

Works to the Snowmelt system); PSPFOF ¶ 4 (distinct rate for thermal hot water energy).  This new method of operations resulted in a noticeable increase in the use of Unit 3 during winter months.  PSPFOF ¶¶ 5-8.

Therefore, contrary to Defendants' assertions, Sierra Club is not arguing that the change in method of operation is simply "to operate more" to create more electricity, Def. Br. at 23, but that Defendants began operating the De Young Unit 3 boiler for a whole new purpose, to create a new product, that was sold into a whole new market (hot water thermal energy).  This is a change in operations and is clearly within the broad and inclusive statutory definition of modifications.  42 U.S.C. § 7411(a)(4) (defining modification as "any" change in method of operation); *New York v. EPA*, 443 F.3d 880, 885-87 (D.C. Cir. 2006) (holding that Clean Air Act's use of "any" before physical and operational changes in 42 U.S.C. § 7411(a)(4) is expansive and covers all changes).

**B.  Removing the Heat Constraint On Units 4&5 Operation By Installing A Bypass Pipeline Instead Of Backing The Units Down Is A Change In Method of Operation.**

The Dilution Pipeline also resulted in a change in the method of operating the JDY Units 4 and 5.  Prior to the Pipeline, operations had to be curtailed to meet the temperature limit on discharges from the plant.  PSPFOF ¶¶ 9-10.  The purpose of the Pipeline, however, was to allow the plant to operate the units free of operating limitation caused by the temperature limit.  PSFOF ¶ 11.  In other words, the plant underwent a change in method of operations: from temperature discharge limited to operating free of temperature limitation constrains.  This change fits within the broad definition of "any change in method of operation" and Defendants point to no reason why it does not.

**C.  The Rochester Utilities Silver Lake Case Defendants Cite Does Not Support Defendants' Arguments**

Defendants argue that the Environmental Appeals Board decision in *In re Rochester Public Utilities*, 11 E.A.D. 593 (EAB 2004)[11], supports their argument that the projects at issue were not physical changes or changes in method of operation for the JDY plant.  (Def. Br. at 19-20.)  A review of the *Rochester* decision, however, does not support Defendants' argument.  First, it is notable that unlike Defendants in this case, the utility in the Silver Lake case <u>actually obtained a PSD permit</u> and complied with the air quality analysis requirements.  *Rochester Public Utilities*, 11 E.A.D. 593, 596 (EAB 2004) ("A PSD permit is required before commencing construction of a major modification to a major stationary source… and RPU does not dispute that it was required to obtain a PSD permit.").[12]  Second, the only  issue in the *Rochester*—and the only issue that the Environmental Appeals Board decided—was the meaning of 40 C.F.R. § 52.21(b)(31) (2003), as incorporated into the definition of "emission unit" on December 31, 2002.  *Rochester*, 11 E.A.D. at 600-03.  That is not the issue here, as Defendant admits.  (Def. Br. at n.6.)  Therefore, it is fatal to Defendants' reliance on the *Rochester* case that the EAB in *Rochester* expressly declined to decide the issue here: what constitutes a change in method of operation of the boilers.  *Rochester*, 11 E.A.D. at 603 ("Petitioner further curtailed its arguments by only maintaining that there was a physical modification… and makes no argument as to whether there would be a change in the method of operation… Accordingly, we decide this matter based on the narrow issue Petitioner actually presented in the Petition for Review, without

---

[11] Defendants cite a slip opinion, but the final opinion has been published in the Environmental Appeals Decisions reporter (E.A.D.).  Sierra Club provides the official citations here by E.A.D. volume and page number.  *See* Environmental Appeals Board Practice Manual at 7-8 (EPA, Sept. 2010).  The decision is available at http://www.epa.gov/eab/disk11/rochester.pdf

[12] To the extent Defendants argue that they are in the same position as the utility in the *Rochester* case, Defendants effectively concede that they should have obtained a permit prior to the project at issue here.  Dkt # 95 (Def. Br.) at 25 (arguing that the *Rochester* Silver Lake plant case is "indistinguishable").

addressing any other possible issues associated with the issuance of PSD…").  In fact, Defendants' brief misleadingly conflates the EPA's decision by the EAB, with a pre-decision document, in the form of a brief by attorneys within EPA.  Dkt # 95 (Def. Br.) at 19-20.  The only authority cited by Defendants that even purports to support Defendants' argument that producing a new product for sale to a new customer is not a "change in method of operation" is a brief filed with the EAB in the *Rochester* case.  *Id*., at 26.  Notably, the EAB (which represents EPA's final decision making body) did not address this issue at all.  *Rochester*, 11 E.A.D. at 603. A single statement in an internal EPA document simply cannot contradict the plain language meaning of "any… change in the method of operation."  42 U.S.C. §§ 7411(a)(4), 7479(2)(C). *Envtl. Defense v. Duke Energy Corp*., 549 U.S. 561, 580 (2007) ("an isolated opinion of an agency official does not authorize a court to read a regulation inconsistently with its language.").[13]

Here, the JDY Unit 3 boiler went from operating to produce only steam to turn a turbine to create electricity serving electricity customers needs to producing both steam and hot water to serve not only electricity customers, but also a new customer for a new product: hot water heat. Nothing in the *Rochester* case says that this is not a change in method of operation, which it clearly is.

## IV.     THE SNOWMELT AND DILUTION PIPELINE PROJECTS WOULD RESULT IN EMISSION INCREASES UNDER THE APPROPRIATE TEST.

As set forth in prior briefing in this case, the appropriate methodology for projecting emission increases, to determine if a project "would result in a significant net emissions increase," 40 C.F.R. § 52.21(b)(2)(i) (1980-2002), was the actual-to-potential test.  Dkt. 43 at 11-

---

[13] If EPA briefs are dispositive as to interpretations of the Clean Air Act and regulations, as Defendants argue, then they must necessarily also be dispositive for the interpretations set forth in Plaintiff's prior motions regarding the actual-to-potential test.  *See e.g.,* Dkt. #$ 43-6, 43-9, 43-10, 43-11, 60-1, 102-1.

23; Dkt. 60 at 2-10; Dkt. 91 at 19; Dkt 102 at 3-10.  It is undisputed that pursuant to that methodology, the Snowmelt and Dilution Pipeline projects would be expected to result in a significant net emissions increase of at least sulfur dioxide, nitrogen oxides, and particulates. Dkt. 91 at 5-6 ¶¶ 24-35, 8-9 ¶¶ 47-58.  In fact, while the PSD program requirements apply based on pre-project determinations, the facts here show that the De Young Unit 3 did increase its fuel consumption during the winter months after the Snowmelt System was implemented, compared to before.  PSFOF ¶¶ 5-8.

<u>**CONCLUSION**</u>

For all of the above reasons, Plaintiff respectfully requests that Defendants cross motion for partial summary judgment on the snowmelt system and the dilution pipeline system be denied.

Dated March 1, 2011.

MᴄGɪʟʟɪᴠʀᴀʏ Wᴇꜱᴛᴇʀʙᴇʀɢ & Bᴇɴᴅᴇʀ LLC

  /s/ David C. Bender

David C. Bender
Christa O. Westerberg
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com

CULLEN WESTON PINES & BACH LLP
Lester A. Pines
122 West Washington Avenue, Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:   (608) 251-2883
pines@cwpb.com

26