## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Sierra Club, | ) | Case No. 1:08-cv-1183 |
| v. | ) | Hon. Paul L. Maloney |
| | ) | |
| CITY OF HOLLAND and HOLLAND | ) | |
| BOARD OF PUBLIC WORKS, | ) | **ORAL ARGUMENT** |
| | ) | **REQUESTED** |
| Defendants. | ) | |
| | ) | |
| | ) | |

---

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO ALL PSD CLAIMS

---

## I.  INTRODUCTION

When Congress established the Clean Air Act's Prevention of Significant Deterioration ("PSD") program, it sought to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990) (hereinafter *WEPCO*), (quoting H.R.Rep. No. 91-1146, 91st Cong., 2d Sess. 1, 1, *reprinted in* 1970 U.S. Code Cong. & Admin. News 5356, 5356.).  Although they have admittedly undertaken numerous large projects at the James De Young plant, Defendants have enjoyed a four-decade reprieve from lower pollution limits and modern pollution controls.  As a result, many hundreds of tons of air pollution, or more, has been emitted into Western Michigan that would have been avoided if Defendants had obtained the requisite permits and installed the required pollution controls when they modified the existing boilers.

Without intervention by this Court, Defendants appear likely to circumvent Congress'
intent that all existing polluters eventually install modern pollution controls.  As explained by the
D.C. Circuit more than thirty years ago: "Implementation of the statute's definition of
'modification' will undoubtedly prove inconvenient and costly to affected industries; but the
clear language of the statute unavoidably imposes these costs except for de minimis increases.
The statutory scheme intends to 'grandfather' existing industries; but the provisions concerning
modifications indicate that this is not to constitute a perpetual immunity from all standards under
the PSD program." *Ala. Power Co. v. Costle*, 636 F.2d 323, 400 (D.C. Cir. 1979); *see also
WEPCO,* 893 F.2d at 909.  The fundamental compromise was that existing facilities would
receive a short reprieve from pollution control requirements, in recognition that existing facilities
would eventually become worn out and would either have to be shut down or undergo major
overhauls—either of which triggers installation of modern pollution controls.  *In re Tenn. Valley
Auth.,* 9 E.A.D. 357, 391-92 (EAB 2000) (*citing WEPCO*, 893 F.2d at 909; *Ala. Power*, 636 F.2d
at 400), *appeal dismissed for lack of jurisdiction,* 336 F.3d 1236 (11th Cir. 2003), *cert. denied,*
124 S. Ct. 2096 (2004).

As Defendants point out, the Act requires a facility to seek a PSD permit before
commencing construction.  They admittedly have not for any of the nine projects at issue; rather,
they advocate that their failure to comply with the pre-construction requirements for more than
five years inoculates them from liability.  This turns Congressional intent on its head, effectively
granting the "indefinite immunity" that Congress intended to avoid when it enacted the PSD
program.  *WEPCO*, 893 F.2d at 909.

Moreover, Defendants seek unfair advantage over those other major facilities that have
complied with the PSD requirements when they have upgraded their facilities.  Defendants

should not reap economic benefit from violating the Act.  *See Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,* 913 F.2d 64, 75 (3d Cir. 1990) ("violators should not be able to obtain an economic benefit vis-a-vis their competitors due to their noncompliance with environmental laws.") (internal quotations omitted).  Avoiding the pollution controls required by law once a facility is replaced or, as here, modified shifts the costs of pollution to the community and allows Defendants to generate and sell power for a lower cost than those who comply with the law.  Whether innocent in motive or not; whether by ignorance, mistake or just neglect, Defendants' reasons for violating are not relevant.[1] The fact is that they have long reaped the benefit of Congress' temporary reprieve and now must fulfill the rest of the bargain by cleaning up their pollution.  Defendants' motion should be denied.

## II.  SIERRA CLUB'S STATEMENT OF SUPPLEMENTAL FACTS AND DISPUTES OF DEFENDANTS' FACTS

### A.  Sierra Club's Statement of Supplemental Undisputed Material Facts.

1.      Water cycles through the boiler system from the boiler feedwater pump to the steam drum, then circulates between the steam and mud drums and to the generating bank tubes and waterwall tubes until it is turned into steam in the steam drum, then enters the superheater tube loops, and goes through the turbine, and then into the condenser where it is made into condensate and then pumped through feedwater heaters, denigrating tank, and back to the feedwater pumps.  Radakovitz Dep. Tr., Doc. #126-3, at 42:15-44:10.  The whole process is a cycle of makeup water through the various stages in the boiler.  *Id*. at 44:11-12, 45:8-12.

2.      In the condensers, lake water runs through tubes and steam travels on the outside of the tubes. When the steam hits the cold lake water running through the tubes, it recondenses

---

[1] Defendants attempt to throw sand with irrelevant speculation of Sierra Club's motives, and bog themselves down in irrelevant procedural history.  *See* Doc. #112, at 1-2.  Because liability under the Clean Air Act is strict, neither Sierra Club's motives nor Defendants' intent are relevant to this case. *United States v. B & W Inv. Properties*, 38 F.3d 362, 367 (7th Cir. 1994); *United States v. Dell'Aquila*, 150 F.3d 329, 332 (3d Cir. 1998).

from steam back into water and goes back into the boiler. Howard Dep. Tr., Doc. #126-1, at 90:21-91:4.

3.      Operations of the condensers affects the boiler water system and steam cycle. Howard Dep. Tr., Doc. #126-1, at 117:9-119:11; Joseph G. Singer, *Combustion Fossil Power* (4th Ed. 1991) at 20-38, 21-12, attached as Exhibit 1.

4.      Condensers are part of the integrated process that includes inter-related parts necessary to generate electricity. Koppe Dec. (April 5, 2011) ¶ 11.

5.      Without the condensers, the process for making energy out of a steam cycle will not operate correctly. In fact, without the condensers, the process would not operate at all. Koppe Dec. (April 5, 2011) ¶ 12.

6.      While the condensers, like various pumps, valves, fuel handling, flue gas ducts, and the smoke stack, are not within the furnace walls (and therefore arguably not part of the "boiler") they are nevertheless part of the overall electric generating unit that must operate together if it is to operate at all. Koppe Dec. (April 5, 2011) ¶ 13.

**B.      Sierra Club's Objections to Defendants' Statement of Material Facts.**

Defendants' "undisputed facts" are really additional argument and/or improper statements based on inadmissible evidence. Certainly, it is disputed that Sierra Club "frustratingly . . . revealed projects" at issue in this case, for example. *See* Doc. #112 at 4, ¶ 1. Sierra Club diligently conducted discovery and amended its case according to the evidence that was (finally) produced by Defendants.

Defendants offer several proposed "facts" that are not based on admissible evidence and, therefore, should not be countenanced by the Court in deciding Defendants' cross-motion. Fed. R. Civ. P. 56(c)(2). Specifically, Defendants rely on the Declaration of David Koster for certain

proposed "facts" of which Mr. Koster lacks any personal knowledge.  Fed. R. Civ. P. 56(c)(4);

Fed. R. Evid. 602; *Briggs v. Potter*, 463 F.3d 507, 512 (6th Cir. 2006) (declarations must be

based on first-hand knowledge or observation).  Mr. Koster opines that the condensers are not

within the legal definition of "emission units."  Koster Dec., Doc. #112-2, ¶ 2; 40 C.F.R. §

52.21(b)(7) (1980-2003) (defining "emission unit"); *see also* Doc. #112 at 4, ¶ 3.  But Mr. Koster

has not been offered as an expert witness and therefore his "expert" opinions cannot be relied

upon.  Fed. R. Evid. 702; Fed. R. Civ. P. 26(a)(2).  Additionally, Mr. Koster's testimony

amounts to nothing more than a legal opinion that condensers are not within the legal definition

of "emission unit."  *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994)

("The meaning of federal regulations is not a question of fact, to be resolved by the jury after a

battle of experts.  It is a question of law, to be resolved by the court."); *Specht v. Jensen*, 853

F.2d 805, 809 (10th Cir. 1988) ("In no instance can a witness be permitted to define the law of

the case."); *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("testimony offering nothing

more than a legal conclusion—i.e., testimony that does little more than tell the jury what result to

reach—is properly excludable under the [Federal] Rules [of Evidence]"); *Hurley v. Deutsche

Bank Trust Co., Americas*, Case No. 1:08-CV-361, 2008 U.S. Dist. LEXIS 80526, *10-*11

(W.D. Mich. Sept. 30, 2008) ("[expert's] affidavit will be excluded from the record because it

consists almost entirely of improper conclusions of law."); *Henry v. Quicken Loans Inc.*, Case

No. 2:04-cv-40346, 2009 U.S. Dist. LEXIS 90126, *19 (E.D. Mich. Sept. 30, 2009) ("The

magistrate judge properly excluded the opinion under Fed. R. Evid. 702 because 'Expert

testimony is not admissible if it does no more than tell the finder of fact what conclusions to

reach.' Weinstein's Federal Evidence, § 702.03.").

III.    ARGUMENT

    A.    **Sierra Club's BACT Claims in Count III are not Barred by the Statute of Limitations; the Sixth Circuit's Decision in *National Parks* is Directly on Point and is Controlling.**

Defendants urge this Court to ignore controlling Sixth Circuit precedent to find that Sierra Club's BACT claims are time-barred.  Doc. #112 at 15-17.  This issue has been squarely decided by the Court of Appeals in *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410 (6th Cir. 2007) ("*National Parks*"), *reh'g en banc denied* 2007 U.S. App. LEXIS 21725 (6th Cir. Aug 14, 2007) and Defendants' arguments to the contrary are without merit.  Sierra Club's claims for penalties for BACT violations are not barred by the statute of limitations and Defendants' motion for summary judgment as to Count III must be denied.

In *National Parks*, the Sixth Circuit held that the applicable PSD regulation "creates an ongoing obligation to apply BACT, regardless of what terms a preconstruction permit may or may not contain." *Id.* at 418.  Notwithstanding Defendants' use of bold type, their statement that the Sixth Circuit's decision in *National Parks* was based on "a unique provision in the Tennessee regulations, **not present in the federal PSD regulations**, Doc. #112 at 16 (bold in original), is simply not true. There is nothing unique about the language relied upon by the Sixth Circuit.  In fact, the regulation in the *National Parks* case and the regulation that applies to Defendants' modifications in this case include the exact same language requiring that a "major modification shall apply best available control technology."  *Compare* 480 F.3d at 417 (quoting Tennessee regulation language) [2] *with* 40 C.F.R. § 52.21(j)(3) (1980-2003) (containing identical language). [3]

---

[2] The Tennessee SIP, at issue in *National Parks*, states: "A major modification <u>shall apply best available control technology</u> for any pollutant for which it would result in a significant net emissions increase at the source." Tenn. Comp. R. & Regs. § 1200-3-9-.01(4)(j)(3) (emphasis added); *see National Parks*, 480 F.3d at 418.  The federal PSD regulation states: "A major modification <u>shall apply best available control technology</u> for each regulated NSR pollutant that it would have the potential to emit in significant amounts."  40 C.F.R. § 52.21(j)(3) (1980-2003) (emphasis added).

Additionally, the *National Parks* Court found compelling that, under the SIP, "[a]pproval to construct shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions of [the SIP] and any other requirements under local, State, or Federal law." *Id*. at 418. This language is effectively identical to its federal counterpart. *Compare* 40 C.F.R. § 52.21(r)(3) with Tenn. Comp. R. & Regs. § 1200-3-9-.01(4)(a)(5). As the Sixth Circuit explained, "even if TVA had obtained a construction permit that did not require BACT," this separate regulatory requirement would prevent TVA from "justify[ing] its post-construction failure to comply with" ongoing BACT requirements. *Id*. That is, BACT emission limits are triggered when a plant is modified, but then apply to the plant each day it is operated and violations of BACT limits happen anew each day that emissions exceed the limits.

Defendants actually concede that the Sixth Circuit's holding is opposite to their argument, *see* Doc. #112 at 16, but then make the untenable argument that it is "not binding" and not even "persuasive" because the deciding panel included a District Court judge sitting by designation. *Id*. Defendants offer no legal authority for ignoring the principles of *stare decisis,* and indeed their argument is contradicted by established law. *See* 28 U.S.C. § 292(a) and (d) (allowing district court judges to sit by designation). Moreover, if a majority of the Sixth Circuit disagreed with the panel decision, it could have granted rehearing—but rehearing was denied. 2007 U.S. App. LEXIS 21725 (6th Cir. Aug 14, 2007).

Several district courts have followed the Sixth Circuit's *National Parks* holding, and have noted that the federal PSD regulation (or SIP language very similar to it) imposes an ongoing

---

[3] This is to be expected. States may adopt the PSD program through state regulations, like Tennessee did (as discussed in the *National Parks* case); however, those States are required to adopt language virtually identical to the federal PSD regulations at 40 C.F.R. § 52.21. *See* 40 C.F.R. § 51.166(j)(3) (1980-2003) (requiring that state plans "shall require that… [a] major modification shall apply best available control technology for each pollutant subject to regulation…"). In other words, the language that the Sixth Circuit relied upon from the Tennessee regulation requiring compliance with BACT in the *National Parks* case is identical to the mandatory language that must appear in the regulations of all states and identical to the language in 40 C.F.R. § 52.21(j)(3) that applied to Defendants in this case.

obligation to comply with BACT – again, separate and distinct from any preconstruction permitting requirements.  *See Sierra Club v. Dairyland Power Coop.*, Case No. 10-cv-303-bbc, 2010 U.S. Dist. LEXIS 112817, *13 (W.D.Wis. October 22, 2010) (Dkt # 104-1) (noting that, "[b]y their own terms, [the Federal PSD regulation and Wisconsin's SIP] create an obligation to apply best available control technology . . . regardless of the terms a preconstruction permit may or may not contain."); *Sierra Club v. Portland Gen. Elec.*, 663 F.Supp. 2d 983, 993 (D. Or. 2009) (construing Oregon SIP language nearly identical to the federal PSD language to hold that "[t]he duty to utilize BACT goes beyond merely installing the technology, but also applies to the operation of the facility.").  Like the Sixth Circuit in *National Parks*, these courts have recognized that BACT limits "are valuable because they apply after a construction takes place, when the plant is operational," thus furthering the CAA's pollution-reduction goals.  *Dairyland*, 2010 U.S. Dist. LEXIS 112817 at *37; *see also Portland Gen. Elec.*, 663 F.Supp. 2d at 993 (noting that it "makes little sense for a PSD permit to set emissions limitations and require pollution control technology, but not require a facility to operate pursuant to those restrictions"); *United States v. Duke Energy, 278 F. Supp. 2d 619, 650-51* (M.D.N.C. 2003), *aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005), *vacated on other grounds*, *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) (holding that BACT limitations are "just as integral to achieving the objectives of PSD as the preconstruction analysis and review" and are "a condition of operation").

The Sixth Circuit's holding in *National Parks* is controlling and establishes that the obligation to comply with BACT requirements under the federal PSD regulation is ongoing. Sierra Club's cause of action under Count III "is actionable, and . . . manifests itself anew each day [Defendants operate] without BACT limits on emissions."  *National Parks*, 480 F.3d at 419.

Sierra Club's claims based on Defendants' BACT violations are not time-barred and Defendants' motion for summary judgment on Sierra Club's Third Claim must be denied.

**B.      Sierra Club's Claims in Counts I, IV, and VI are not Barred by the Statute of Limitations.**

Defendants argue incorrectly that all of Sierra Club's claims in counts I (PSD permit claim for penalties) and IV (Title V / Renwable Operating Permit claim) are time-barred because they "accrued" prior to 2000, and that count VI (claim for declaratory relief) is barred by the concurrent remedy doctrine.  Doc. #112 at 6-14.  Defendants' arguments on these points are nearly identical to its arguments presented to the Court in their Cross Motion for Partial Summary Judgment, Doc. #95, at 10-15, and were rebutted by Sierra Club in its Response in Opposition to Defendants' Cross Motion for Partial Summary Judgment.  Doc. #104 at 4-20. Sierra Club therefore does not repeat its arguments in full in this brief, but incorporates that response here by reference and further responds as follows.

Sierra Club agrees that the five-year statute of limitations in 28 U.S.C. § 2462 applies to its claims *for civil penalties* under the Clean Air Act, and that the limitations period begins to run on the date the respective claim accrued.  *See* Doc. #112 at 7.  But it does not follow that Sierra Club's claims are therefore time-barred.  Defendants' argument that it does makes several incorrect leaps of logic.  First, a claim "accrues" when it is discovered, not when an illegal act first occurs.  The statute of limitations for penalties did not begin to run until Sierra Club discovered Defendants' CAA violations – and Defendants have put forward no facts to establish when that date was.  Second, Defendants failed to obtain and operate according to the Clean Air Act's PSD program requirements, resulting in an ongoing series of CAA violations, and those discrete violations within the five-year limitations period are actionable even if others outside that period are time-barred.  Defendants' argument conflicts with controlling caselaw by the

9

Sixth Circuit and Defendants' attempt to distinguish it is without merit.  And third, even

assuming *arguendo* that Sierra Club's claims for penalties are time-barred under 28 U.S.C. §

2462, its claims for declaratory and injunctive relief are not.  Defendants' motion for summary

judgment on the PSD claims[4] should be denied.

> 1.  The Five-Year Statute of Limitations Begins to Run Upon Sierra Club's Discovery of the Violation and Defendants Cannot Show That The Claims Accrued More Than Five Years Ago.

As explained by Sierra Club in its Brief in Response to Defendants Cross-Motion for

Summary Judgment, Doc.  #104 at 5-6, Sierra Club's claims "accrued" not on the dates the

projects in question occurred, but rather on the dates Sierra Club discovered them.  *Dixon v.*

*Clem*, 492 F.3d 665, 671 (6th Cir. 2007) ("This court follows the 'discovery rule,' which

provides that the statute of limitation begins to run when the plaintiff knows or has reason to

know of the injury which is the basis of his action and that a plaintiff has reason to know of his

injury when he should have discovered it through the exercise of reasonable diligence.") (internal

quotations omitted); *Dairyland*, 2010 U.S. Dist. LEXIS 112817 at *19.  Numerous courts have

applied the discovery rule to claims for civil penalties under environmental statutes, including

the Clean Air Act, specifically noting "the difficulty of detecting such violations; the inevitable

reliance of government agencies on a system of permits and self-reporting to enforce the Act;

and the Act's overall goal[s]" in applying the discovery rule.  *Dairyland*, 2010 U.S. Dist. LEXIS

112817 at *19-20 (quoting *L.E.A.D. v. Exide Corp.*, 1999 U.S. Dist. LEXIS 2672, 1999 WL

124473, at *4 (E.D.Pa. Feb. 19, 1999)); *see also Powell Duffryn,* 913 F.2d at 75; *New Jersey v.*

*Reliant Energy Mid-Atlantic PowerHoldings, LLC,* 2009 U.S. Dist. LEXIS 91617, 2009 WL

3234438 (E.D. Pa. Sept. 30, 2009).  Because Defendants "failed to apply for a permit or disclose

---

[4] As Defendants note, Sierra Club's Fifth Claim for Relief (violation of the requirement to submit a Part 2 MACT hammer application) is not at issue here.

[their] modifications," *Dairyland,* 2010 U.S. Dist. LEXIS 112817 at *21, Sierra Club had no realistic way of knowing of the alleged violations at the time they first occurred.

Application of the statute of limitations is an affirmative defense for which Defendants carry the burden of persuasion, and at this stage Defendants have put forward <u>no facts</u> to establish when Sierra Club discovered Defendants' violations; thus disposition at summary judgment is not appropriate. *Reliant Energy*, 2009 U.S. Dist. LEXIS 91617 at *37-38. Defendants' motion should be denied.

2. <u>PSD Permitting Involves Many Requirements Beyond Obtaining A Piece of Paper Before Constructing</u>.

Even assuming, *arguendo*, that the discovery rule did not apply to Plaintiff's PSD claims, the statute of limitations would not prevent claims for penalties because Defendant has committed repeated, discrete, and ongoing daily violations of the CAA each day that it failed to obtain a permit and comply with the substantive PSD program provisions. Defendants argue that the Court should ignore the ongoing nature of their PSD violations to find that Claim I is barred by the statute of limitations. Doc. #112 at 7-12. In so doing, Defendants misconstrue the nature of the PSD program and neglect the continuing operational requirements it imposes.[5] The failure to obtain – and comply with – a PSD permit and PSD emission limitations present ongoing violations, regardless of the date construction was commenced and when Sierra Club discovered it, and Sierra Club may still seek relief for those separate violations that occurred within the limitations period (i.e., in the five years preceding the complaint).

Cases finding PSD violations to be one-time violations (at the moment construction commences and continuing through the construction phase) miscomprehend the PSD regulatory

---

[5] Sierra Club addressed the PSD program's many ongoing operational requirements in considerable detail in its Response in Opposition to Defendants' Cross Motion for Partial Summary Judgment, Doc. #104 at 8-14, and does not repeat its arguments here in the interest of brevity.

program.  The PSD program requires a pre-construction permit prior to construction, but does so in conjunction with the program's ongoing obligations to comply with its mandatory emissions limitations and other obligations that—once triggered by commencing construction—continue to apply to the facility long after construction has finished.  In other words, the permitting program is about the air pollution prevention substantive requirements; it does not exist merely to create a piece of paper labeled "permit."  For example, construing the same federal PSD regulatory language applicable here, the Western District of Wisconsin recognized that "a careful review of the statutory language makes it apparent that the title 'preconstruction' requirements does not reflect the true nature of a PSD permit's ongoing pollution control requirements, or the program's overall goals to maintain air quality."  *Dairyland*, 2010 U.S. Dist. LEXIS 112817 at *34; *see also Portland Gen. Elec.,* 663 F. Supp. 2d at 994 (holding the same).  The Fifth Circuit has similarly recognized that the use of the phrase "preconstruction permit" contradicts the true nature of the PSD permitting program.  *United States v. Marine Shale Processors,* 81 F.3d 1329, 1355 (5th Cir. 1996).  While there are different permits labeled "preconstruction" and "operating," the point of both is to "include limits on a source's operations" and a "preconstruction" permit regulates operations and not merely the construction process.

Because of the ongoing nature of the PSD program's various forward-looking requirements, the statute of limitations does not bar Sierra Club's PSD claims and Defendants' motion for summary judgment must be denied.  Moreover, as set forth below, even if the PSD permitting obligations only apply prior to construction, the statute of limitations would still not bar Plaintiff's injunctive and declaratory relief in this case.

        3.     <u>The Concurrent Remedy Doctrine does not Apply to Clean Air Act Citizen Suits and thus does not Bar Sierra Club's Claim for Injunctive and Declaratory Relief</u>.

Defendants next assert that Sierra Club's claims for injunctive and declaratory relief are also time-barred by application of the concurrent remedy doctrine. Doc. #112 at 13-14. Because the applicable statute of limitations only limits claims for penalties, 28 U.S.C. § 2462, Defendants awkwardly attempt to bootstrap a bar on all other types of relief by applying the "concurrent remedy" doctrine. First, as discussed above, because Plaintiff's claims for civil penalties are not time-barred, there is no reason to examine Defendants' contingent argument. However, even assuming *arguendo* that Plaintiff is time-barred from seeking penalties, there is no barrier to it seeking injunctive and declaratory relief. The concurrent remedy doctrine, which limits claims for equitable relief where claims for damages are beyond the limitations period, has no application here where no damages are at issue. *Madison v. Wood*, 410 F.2d 564, 567-68 (6th Cir. 1969). This is an enforcement action, not an action for damages at law. Defendants' concurrent remedy theory could only be persuasive if Sierra Club was seeking—or even able to seek under the statutory scheme—damages. It is not; every form of relief authorized by the CAA is inherently equitable in nature, and thus the concurrent remedy doctrine does not apply. *See A-C Reoganization Trust v. E.I. DuPont de Nemours & Co.,* 968 F. Supp. 423, 429 (E.D.Wis. 1997) (explaining that environmental citizen suits "really are equity suits" and thus the concurrent remedy doctrine does not apply).

Among several forms of equitable relief, the CAA authorizes the imposition of civil penalties, which are payable to the U.S. Treasury. Civil penalties do not serve the same function as a remedy of damages at law; rather, they serve "to deter future violations and thereby redress the injuries that prompted a citizen suitor to commence litigation." *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 174 (2000); *see also United States v. Cinergy Corp.*, 495 F. Supp. 2d 892, 1032 (S.D. Ind. 2007) (declining to apply the concurrent remedy doctrine because

"the primary purpose of civil penalties is deterrence, not reward to the plaintiffs[.]").  Put another way, since this case lacks a claim for damages, there is no concurrent remedy doctrine to apply. A claim for equitable and declaratory relief is not tied by the concurrent remedy doctrine to the limitations period of a claim for civil penalties.

Furthermore, the concurrent remedy doctrine has been held not to apply to the United States when it acts in "its official enforcement capacity."  *Sierra Club v. Duke Energy Ind.*, Case No. 1:08-cv-437-SEB-TAB, 2010 U.S. Dist. LEXIS 97260, *32 n.19 (S. D. Ind. Sept. 14, 2010). Plaintiffs in environmental citizen suits stand in the shoes of the United States and serve as "private attorneys general" to enforce federal laws and regulations.  *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Assoc.*, 453 U.S. 1, 16-17, 17 n. 27, and 21 (1981).  The application of the concurrent remedy doctrine to citizen suits is therefore inconsistent with this overarching enforcement scheme under the CAA.  *See United States v. Am. Elec. Power,* 136 F. Supp. 2d 808, 811 (S.D. Ohio 2001) (declining to apply the concurrent remedy doctrine to claims for injunctive relief brought by either the United States, or by a citizen group under the CAA citizen suit provision).  The concurrent remedy doctrine has no applicability here and Sierra Club's claim for injunctive and declaratory relief is not time-barred.

4.    Sierra Club's Title V and Renewable Operating Permit Claims (Claim IV) are Actionable and are not Time-Barred.

Defendants make a vague argument that "there is no concurrent and continuing obligation vis-à-vis Title V and the [Renewable Operating Permit ("ROP")] Program to obtain a permit to install."  Doc. #112 at 12.  Defendants appear to be conflating a number of different permitting requirements.  Sierra Club's Count IV in the Amended Complaints sets forth a claim for Defendants' violations of the Clean Air Act's Title V operating permit program.

14

Separate from the PSD permitting program in 42 U.S.C. § 7475 and 40 C.F.R. § 52.21, the Clean Air Act also contains an operating permit program in subchapter V and EPA's regulations in 40 C.F.R. part 70.  These permits are typically called either "Title V" permits or "Part 70" permits.  EPA granted interim approval of Michigan's Title V permit program, effective February 10, 1997, and final approval effective November 20, 2001.  40 C.F.R. pt. 70, Appx A (setting forth EPA's approvals).  Pursuant to 42 U.S.C. § 7661a(a), after the effective date of a permit program, it is illegal to: (i) "violate any requirement of a permit" issued pursuant to that program; or (ii) operate a major facility that is required to have a permit (including those required to have a PSD permit) without such permit.  Therefore, violating a Title V permit, or operating without a permit where one is required, is illegal.

Defendants violated 42 U.S.C. § 7661a(a) in two ways.  First, by making the major modifications at issue in this case they triggered the requirement to apply for and obtain a Title V permit immediately upon modification.  42 U.S.C. § 7661a(a) ("it shall be unlawful for any person… to operate… any other source required to have a permit under parts C [PSD] or D [Nonattainment NSR] of subchapter I of this chapter… except in compliance with a permit issued by a permitting authority under this subchapter.").  EPA's regulations make clear that, in addition to triggering requirements to obtain a permit for the modification pursuant to the PSD program, and comply with BACT emission limits, the projects at issue triggered the requirement to obtain an operating permit for the modified facility "within 12 months after commencing operation" following the project.  40 C.F.R. § 70.5(a)(1)(ii); *see also* Mich. Admin. Code r. 336.1201, 336.1215, 336.1216(2) and (3); Mich. Stat. § 334.5507(1)(f).  Defendants have not shown, and cannot show, that they obtained any such permit addressing the PSD requirements triggered by the projects at issue in this case that occurred after February 10, 1997 (i.e., Projects

9 and 10) within 12 months of "commencing operation" following each respective project. Notably, such an application would have avoided the need for this litigation altogether since it would have resulted in the state-issued permit identifying PSD and BACT as applicable requirements, and a compliance schedule to bring the facility into compliance with those requirements (without the need for enforcement litigation). *See* 40 C.F.R. §§ 70.5(c)(8)(ii)(C), (iii)(C) and (iv) (requiring application to have a "schedule of remedial measures, including enforceable sequence of action with milestones, leading to compliance…"), 70.6(c) (3), (4) (requiring a permit to include compliance schedule applied for).

Second, for modifications that occurred after Defendants were issued a Title V permit (i.e., Project 10) it was a violation of Defendants' operating permit to make the modifications without the required permit to install. Specifically, one standard condition contained in each of Defendants' operating permits provided that "[t]he process or process equipment included in this permit shall not be reconstructed, relocated, or modified unless a PTI authorizing such action is issued by the department[.]" *See, e.g.*, Permit No. MI-ROP-B2357-2006a (revised November 13, 2007), at 12 (attached hereto as Exhibit 2). Therefore, by making the modifications at issue in this case after Defendants' first Title V permit was issued in May, 2000, Defendants violated this condition of their permit—contrary to 42 U.S.C. § 7661a(a). These are ongoing violations since Defendant has yet to get the required permits to install pursuant to this ongoing obligation in its operating permits, and are therefore not time-barred for the same reasons Sierra Club's PSD permit claims are not time-barred. *See infra* pp. 8-11. These violations of the Title V program give rise to Sierra Club's claims in addition to the violations of the PSD program and BACT limits.

16

**C.      Sierra Club Provided Holland with Adequate Notice Regarding the BACT Claim Arising from Project 10.**

Defendants assert that Sierra Club's notice with respect to the BACT claim for Project 10 was inadequate because Sierra Club identified the project as occurring "in or about 2002 to 2003" in its First Notice of Intent, when the project actually occurred in the year 2000.  Doc. #112 at 19.  Defendants misread the CAA's notice requirements, and fail to recognize that Sierra Club fulfilled its obligation to provide sufficient information for the Defendants to identify the CAA violations alleged.  Moreover, Defendants' claim of ignorance as to Project 10 holds no water because Project 10 was a "once in a boiler's lifetime" wholesale condenser retubing project of which Defendants themselves were uniquely positioned to identify—and, indeed, did identify it based on the notice letter.  Defendants' claim that notice for the Project 10 BACT claim was inadequate must be rejected.

The CAA's citizen suit provision requires citizens to give advance notice of their intent to file suit.  42 U.S.C. § 7604(b)(1)(A). That notice must contain:

> sufficient information to permit <u>the recipient</u> to identify the specific standard, limitation, or order which has allegedly been violated, the activity alleged to be in violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name and address of the person giving the notice.

40 C.F.R. § 54.3(b) (emphasis added).  Importantly, EPA's notice regulation does <u>not</u> require citizens to include in the notice letter the precise dates of the alleged violation; rather, they must include information that allows <u>the alleged violator</u> itself to identify those dates.  *Id.*; *see also Pub. Interest Research Group v. Hercules, Inc.*, 50 F.3d 1239, 1249 (3d Cir. 1995) (holding that notice is sufficient under the Clean Water Act's citizen suit provision if the "alleged violator [was] provided with enough information to be able to bring itself into compliance.")

17

Such a reading is consistent with the purpose of the notice requirement, which is to allow the defendant to identify the alleged violations so that it may take remedial action of its own initiative. *Hercules,* 50 F.3d at 1249; *Atlantic States Legal Found. v. Stroh Die Casting Co.*, 116 F.3d 814, 819-20 (7th Cir. 1997) ("The key to notice is to give the accused company the opportunity to correct the problem."); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 400 (4th Cir. 2011) ("the requirement of adequate notice does not mandate that citizen plaintiffs list every specific aspect or detail of every alleged violation.") (internal quotations omitted).

Citizens typically do not have access to detailed information about a facility's operations prior to litigation. The facility's owners and operators <u>do</u> have access to that information, however, and are in a far better position to identify the precise dates of the alleged violations – hence the use of the phrase "permit the recipient to identify" in the CAA's notice provision. *See, e.g., San Francisco Baykeeper v. Tosco Corp.*, 309 F.3d 1153, 1158-59 (holding in a CWA case that the defendant was "obviously in a better position than [the plaintiff] to identify the exact dates, or additional dates, of its own [activities].") Sierra Club provided sufficient information for the Defendants to identify precisely the project at issue and when it occurred.

Sierra Club described Project 10 in its First Notice of Intent as a project "[i]n or about 2002 to 2003" that involved the retubing of "Unit 5's condensate and bearing water coolers" and was "paid for with capital funds." Doc. #95-4 at 4.[6] Defendants do not assert that Project 10 did not take place, or that they lacked sufficient information from Sierra Club's First Notice of Intent to be able to identify the project itself. *See* Doc. #112 at 19-20, ¶¶ 5-7. Indeed, they hardly could have; Project 10 involved a complete retubing of the Unit 5 condenser tubes, a "once-in-a-

---

[6] Project 10 was also included in Sierra Club's Second Notice of Intent, and described similarly as the replacement of "more than 4,000 condenser tubes . . . at Unit 5 using capital funds" and taking place "[i]n or about 2000." Doc. #96 at 4.

lifetime" project that had not occurred for the entire 33-year life of the boiler and is not expected to ever occur again at Unit 5.  *See* Doc. #125, ¶¶ 141-42.  Sierra Club's notice as to Project 10 was more than adequate to allow Defendants to identify the major project and rectify its failure to follow BACT requirements.

Defendants' reliance on the Sixth Circuit's holding in the *United Musical Instruments* case is unavailing.  Doc. #112 at 19 (citing *Atlantic States Legal Found. v. United Musical Instruments, U.S.A., Inc.*, 61 F.3d 473 (6th Cir. 1995)).  In that case, the court was considering whether notice for four violations of annual reporting requirements was sufficient to include in the complaint a separate and additional violation in a later year.  *Id*. at 478.  The plaintiff sought to "tack on" another claim by bringing suit for an additional violation, based solely on the notice letter's general statement that the plaintiff intended to file suit for other "violations not yet known."  *Id*.  That is not the case here; there is no dispute that Sierra Club identified the specific Unit 5 condenser retubing project that forms the basis for the Project 10 BACT violation.  Sierra Club is not seeking to shoehorn additional violations into its otherwise adequate notice for Project 10.  To the contrary, it issued a second notice of intent to give Defendants notice that it was aware of additional violations that may become subject of an enforcement action.  *See* Doc. #96.  In any event, the court's holding in *United Musical Instruments* has been called into question by the Sixth Circuit's subsequent decision in *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004), in which the court recognized that "[i]t may well be true that private plaintiffs need not send additional notice letters for violations of the "same type" once they have filed a complaint."  *Id*. at 478.  For this proposition the court cited *Hercules,* 50 F.3d at 1250, a case that again reaffirms the purpose behind the notice requirement: to enable the defendant to identify and precisely date the alleged violations.

19

Sierra Club provided sufficient notice for the BACT claims related to Project 10, as well as to Projects 1, 5, and 9, in its First Notice of Intent to allow Defendants to identify the basis for the claim.  Because Sierra Club has complied with the CAA's notice requirements, Defendants' motion for summary judgment as to Project 10 should be denied.

**D.**     **There is no Basis in Law to Limit BACT to only Part of the Facility or the Generating Unit.**

Defendants argue that modifications made to the power plant's condensers did not trigger the requirement of BACT because the condensers are not part of the same "emission unit" as the boilers.  Doc. #112 at 20-21.  Defendants contend that 40 C.F.R. § 52.21(j)(3) (1980-2002) applies BACT to the "emissions unit" at which the emission increase occurs, but that the only part of the JDY plant that emits are the boilers and the condensers are not part of the boilers.  *Id*. Defendants' argument is wrong for two reasons.  First, 40 C.F.R. § 52.21(j)(3)(1980-2002) has to be interpreted consistent with the Clean Air Act, which applies BACT to the entire "facility," and not to one subpart.  Second, even under Defendants' erroneous interpretation, the condenser and boilers are part of the same "emission unit."  The power plant uses an integrated system that includes the boiler and the condenser, along with various other components, into a single "emissions unit."

1.     <u>BACT Applies to the Entire Modified Facility, not Merely to Subparts of a Facility.</u>

The Clean Air Act requires BACT limits for the entire "facility" that is modified, and not merely to certain pieces of it.  42 U.S.C. §§ 7475(a)(4) ("the proposed <u>facility</u> is subject to the best available control technology for each pollutant… emitted from, or which results from, such facility") (emphasis added), 7479(3) (defining BACT as "an emission limitation based on the maximum degree of reduction of each pollutant… emitted from or which results from any <u>major</u>

emitting facility…") (emphasis added).  Defendants assert that BACT only applies to "the

boilers" and only if the boilers, as defined by Holland, are modified.  This argument contradicts

the statute, however, which prohibits any construction (which includes modifications) on any

"major emitting facility" unless the entire "facility is subject to the best available control

technology" whenever the "facility" is modified.  42 U.S.C. § 7475(a)(4) (emphasis added).

There is nothing in the statute that limits BACT to only some subpart of the facility.  *Id*.

There is also nothing in the first sentence of 40 C.F.R. § 52.21(j)(3) (1980-2003) that

applies BACT only to the boiler.  Defendants, however, interpret the second sentence in §

52.21(j)(3) to reverse course and contradict the statute by applying BACT limits only when

specific "parts" of the facility (boilers) are modified.  Such interpretations, which conflict with

the plain statutory language, are to be avoided.  *Progressive Corp. & Subsidiaries v. United

States*, 970 F.2d 188, 192-193 (6th Cir. 1992) ("Wherever possible, courts should read

regulations to be consistent with the statutes that authorize them, and a construction that thwarts

the statute which the regulation implements is impermissible.")  Defendants' interpretation must

accordingly be avoided.

## 2.    The Condenser is Part of the Emission Unit.

Even if BACT limits only apply to the emission unit that is modified, Defendants offer no

basis for dividing the boiler from the rest of the integrated generating unit.  Only by creating this

artificial and arbitrary division can Defendants argue that the boilers are the only emission units

and that all other connected and integral parts of the generating unit are outside the scope of

regulation.  In fact, under Defendants' theory, BACT only applies when the smokestack is

modified because the smokestack is the only sub-component of the facility that "ha[s] the

potential to emit" any pollutants.  *See* Doc. #112 at 20.  Defendants would allow an entire plant

to be rebuilt without modern pollution controls so long as the smokestack remains.  This turns the entire program on its head—directly contrary to congressional intent.  *Ala. Power,* 636 F.2d at 400.

Contrary to Defendants' unsupported and unreasoned conclusion that the condensers are separate from the other parts of the De Young generating facility, the boilers and the condensers, along with other connected and integrated parts are all part of the plant's emission units.  An "emission unit" is defined as "any part of a stationary source which emits or would have the potential to emit any pollutant[.]"  40 C.F.R. § 52.21(b)(7).  In this case, the De Young plant emits pollutants out of its smokestacks, but the emissions are from the overall fuel combustion and steam generation process upstream.  Pls. Suppl. Prop. Finding of Fact (PSFOF), *supra* pp. 4-5, ¶¶ 1-6.  These parts operate as a system, and that system creates air pollution emissions as a byproduct.  The condenser is part of the integrated steam cycle, which includes the boiler and additional components.  *Id.*  Indeed, the condensers are central to the boilers' water chemistry.  The smokestack emits the pollution, but the emissions are a result of the entire cycle and not the smokestack, the boiler, the fuel conveyors, *or* the condenser operating alone.  *Id.*  Defendants' attempt to draw an arbitrary line just before the condenser components of the integrated system and to pretend they are not connected to the furnace and the smokestack is baseless.  For these reasons, BACT does apply to the condenser tube replacement projects (Projects 5 and 10).

## IV.  CONCLUSION

For the foregoing reasons and for the reasons set forth in its response to Defendants' cross motion for summary judgment relating to application of the statute of limitations, Doc. # 104, pp. 4-20, Sierra Club respectfully requests that the Defendants' motion for summary judgment as to all PSD claims be denied.

Respectfully submitted this 12th day of April, 2011.

McGILLIVRAY WESTERBERG & BENDER LLC

  /s/ David C. Bender

David C. Bender
Christa O. Westerberg
Pamela R. McGillivray
305 S. Paterson Street
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
bender@mwbattorneys.com
westerberg@mwbattorneys.com


CULLEN WESTON PINES & BACH LLP
Lester A. Pines
122 West Washington Avenue, Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:   (608) 251-2883
pines@cwpb.com