**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| SIERRA CLUB, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>CITY OF HOLLAND and HOLLAND )<br>BOARD OF PUBLIC WORKS, )<br>)<br>Defendants. )<br>)<br>) | Case No. 1:08-cv-1183<br>Hon. Paul L. Maloney |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS FIFTH MOTION
FOR PARTIAL SUMMARY JUDGMENT REGARDING EMISSIONS INCREASES
UNDER THE "ACTUAL TO POTENTIAL" TEST**

McGILLIVRAY WESTERBERG & BENDER LLC
David C. Bender
Christa O. Westerberg
Pamela R. McGillivray
211 S. Paterson Street, Ste 320
Madison, WI 53703
Tel. 608.310.3560
Fax 608.310.3561
Email: bender@mwbattorneys.com
       westerberg@mwbattorneys.com
       mcgillivray@mwbattorneys.com

CULLEN WESTON PINES & BACH LLP
Lester A. Pines
122 West Washington Avenue, Suite 900
Madison, WI 53703
Telephone: (608) 251-0101
Facsimile:  (608) 251-2883
Email: pines@cwpb.com

I.  **INTRODUCTION**

In their Response to Plaintiff's Fifth Motion for Partial Summary Judgment, Defendants attempt to overcome black-letter administrative law by relying primarily upon – to borrow Defendants' own language – the "ephemeral viewpoint" of a former EPA "bureaucrat," Gary McCutchen.  (Def.'s Resp. in Opp'n to Pl's Fifth Mot. for Partial Summ. J., Doc. #166, at 1.) (hereinafter, "Def.'s Resp.")[1]  Mr. McCutchen's testimony provides nothing more than a series of improper legal assertions dressed up as proposed "facts."  Moreover, as Mr. McCutchen himself acknowledges, his disagrees with EPA's formal and consistent interpretation of that agency's own PSD regulations.  (McCutchen Dep. Tr. at 143:15-19.)[2]  Lacking any support in EPA's formal interpretations of the EPA regulations at issue, Defendants' entire argument falls back on (a) an outdated case from another Circuit that was superseded by EPA's 1992 rulemaking and the agency's contemporaneous interpretations; (b) an untenable reading of the 1992 Rule's plain language; and (c) Defendants' whole-cloth invention of EPA interpretations based on nothing more than silence by EPA in select enforcement cases.  At bottom, this case only requires application of the plain language of EPA's PSD regulation, and EPA's controlling interpretation of it, to determine that Defendants' modifications increased emissions and triggered Clean Air Act requirements.  Plaintiff's Fifth Motion for Partial Summary Judgment should be granted.

---

[1] Ironically, while Defendants rely on Mr. McCutchen's testimony as the primary basis for their legal interpretations, they simultaneously gripe about statements of official EPA policy by other EPA officials that contradict Defendants.  (*See* Def.'s Resp. at 1, 16-18.)

[2] Relevant excerpts from the deposition transcript of Defendants' expert Gary McCutchen are attached as Exhibit 1 to the Declaration of David C. Bender, dated June 10, 2011, filed herewith.

II. **PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS.**

Defendants' statement of "proposed facts" ignores the Federal Rules of Evidence and contains numerous legal assertions (by an unqualified witness) as "facts." (Def.'s Resp. at 4-5, ¶¶ 13-17.) Several of these proposed "facts" must be rejected because they contain nothing more than inadmissible legal conclusions; some must also be excluded because they lack relevance to the applicable law in this case.

First, Defendants' proposed facts ¶¶ 13-15 are improper legal opinions of Defendants' expert and are therefore inadmissible for the reasons already detailed by Plaintiff.[3] *Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997); *see also United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 880 (S.D. Ohio 2003) (explaining in a Clean Air Act case that "[a]n expert's opinion, which essentially contradicts the language or premise of the law, is entitled to little, if any, weight.").

Second, Defendants' proposed facts ¶¶ 12 and 16 are inadmissible because they lack relevance to this case. In their proposed fact ¶ 12, Defendants state the work experience of Mr. McCutchen. Since McCutchen testifies only about legal interpretations and not about facts, his work experience is irrelevant. No amount of work experience would qualify a witness to testify to what the law is, or should be. Similarly, Defendants' proposed fact ¶ 16 merely states that Plaintiff's expert is not offering opinion testimony about the correct emissions test (i.e., the applicable law). This is hardly relevant, since it merely notes that Plaintiff properly relies on experts for factual opinions and not to pontificate about what the law is, or should be.

---

[3] Plaintiff has previously briefed the impropriety of submitting legal assertions as proposed facts. Dkt. ##101, at 4-9, 171-1 at 11-12.

Third, proposed facts based on Mr. McCutchen's legal opinions regarding emissions tests are not only inadmissible, as noted above, but they are <u>directly undermined</u> by statements made by Mr. McCutchen in deposition. He admits, for example, that his opinions are contradicted by EPA's longstanding presumption that "postproject actual [emissions] defaulted to potential" to emit under both the 1980 and 1992 PSD Rules, and that EPA "certainly used [the actual-to-potential test] as their default test . . . up until at least the late 1990's." (McCutchen Dep. Tr. at 144:9-12; 147:18-19.) Moreover, Mr. McCutchen explicitly concedes that his personal opinions as to the applicable law actually conflict with EPA's official interpretation and represent a "longstanding disagreement [McCutchen has] with EPA policy." (*Id*. at 143:15-19.)[4] Thus, whatever McCutchen's opinions about what the law should be, they are not the opinions of the agency he once worked for. Interpretations by an individual that conflict with the authoritative interpretations by the agency are irrelevant and unhelpful to resolving the issue at hand, and should not be admitted.

### III. ARGUMENT

Defendants' Response contains several fundamental legal errors. First, as to Project 1, Defendants rely solely on the Seventh Circuit's *WEPCO* decision interpreting the 1980 Rules (Def.'s Resp. at 8-11, 18), but fail to account for EPA's controlling interpretation of the 1980 PSD Rules,[5] or for the First Circuit's holding deferring to EPA's interpretation in *Puerto Rican Cement, Inc. v. EPA*, 889 F.2d 292 (1st Cir. 1989).

---

[4] Not only are Mr. McCutchen's opinions undermined by the EPA's controlling interpretation, but they are undermined by his own prior use of the actual-to-potential test. As admitted at deposition, Mr. McCutchen used the actual-to-potential test to calculate emissions increases as an expert witness in *U.S. v. Murphy Oil*, Western District of Wisconsin Case No. 00-C-409-C (McCutchen Dep. Tr. at 161-63.)

[5] As has been amply briefed, two versions of EPA's Prevention of Significant Deterioration ("PSD") regulations are at issue in this case. The "1980 PSD Rules" were operative from 1980-1992, and were significantly amended by EPA in the 1992 Rule (also known as the "WEPCO Rule") that applied from 1992 through 2002. *See* Doc. #43, at 11-19; Doc. #110, at 10-18. The language of both regulations relevant to this case is the definition of "actual emissions" as codified at 40 C.F.R. § 52.21(b)(21)(i)-(v).

3

Second, as to Projects 5 and 9, Defendants attempt to downplay EPA's 1992 notice-and-comment rulemaking that replaced the 1980 Rules that were interpreted in the *WEPCO* decision. That rulemaking expressly limited the instances where Defendants' preferred "representative-actual" (or "projected-actual") test can be applied. Rather than address the 1992 Rule, Defendants make the untenable argument that EPA's explicit policy choices in the 1992 rulemaking should be ignored and that the Court should instead apply the 1980 Rule, and the Seventh Circuit's interpretation of it, even to projects occurring after 1992. (Def.'s Resp. at 12-14, 18-19.) The 1992 rulemaking is fatal to Defendants' reliance on the 1980 Rule and the *WEPCO* decision interpreting that rule. Defendants cannot pretend that the 1992 rulemaking never occurred.

Third, Defendants ignore the plain language mandatory post-modification reporting requirements of § 52.21(b)(21)(v) (1992). Defendants chose not to make the requisite reporting on which their preferred emission test is conditioned; they cannot later attempt to use that test anyway. They already ate their cake, they cannot have it too.

  A. <u>Project 1 requires the actual-to-potential test because it pre-dated the WEPCO Rule's codification of the actual-to-representative-actual test.</u>

Project 1 (which occurred in 1988) is the only project addressed in the instant motion that occurred while the 1980 PSD Rule was in effect. Defendants urge the Court to overlook EPA's interpretation of this regulation and the statements of their own expert supporting use of the actual-to-potential test to rely, instead, on the Seventh Circuit's isolated decision in *WEPCO*, which was a fact-specific application of the regulation to certain fact-specific projects at issue in that case. Defendants' argument is without merit and must be rejected.

Between promulgation of the 1980 PSD Rule and the Seventh Circuit's *WEPCO* decision in 1990, only the actual-to-potential test was applied. (*See* Doc. #43 at 11-16; Doc. #110 at 10-

4

13.) EPA applied this test – uniformly and consistently – to all new and major modified sources because it reasonably concluded that such units had not "begun normal operations," thus requiring the use of a facility's potential to emit as the metric for projecting the source's post-modification actual emissions per 40 C.F.R. § 52.21(b)(21)(iv). *See* 45 Fed. Reg. 52,676, at 52,677 (Aug. 7, 1980). Defendants' assertion that the Clean Air Act looks to increases in emissions misses the point. (Def.'s Resp. at 7-9) (citing 42 U.S.C. § 7411(a)(4)). The question is what method to use to determine if emissions increased. The Act itself does not dictate the method—necessarily leaving it to EPA to define. EPA's 1980 PSD Rule and use of the actual-to-potential test accounts for the inherent impracticability of reliably determining what a facility will emit *after* a project, when the analysis is supposed to be done well *before* the project occurs (i.e., the point in time when PSD applicability is supposed to be determined and permits applied for).[6]

The First Circuit in *Puerto Rican Cement, Inc. v. EPA* applied Supreme Court precedent and gave the requisite deference to EPA's actual-to-potential test under the 1980 PSD Rule. 889 F.2d 292 (1st Cir. 1989). Defendants assert that *Puerto Rican Cement* involved construction of a new facility, instead of a modified unit;[7] this is an irrelevant distinction since the same regulation applies to both new and modified units. (Def.'s Resp. at 10-11.) Moreover, as the First Circuit

---

[6] Defendants' reliance on *New York v. EPA* is misplaced. (Def. Br. at 7-8) (citing *New York*, 413 F.3d 3, 40 (D.C. Cir. 2005)). First, the D.C. Circuit's position is no different from EPA's historic application of the PSD program, which (a) relies, as the statute requires, on increases in actual emissions, but (b) uses potential to emit as a regulatory mechanism to project <u>future</u> actual emissions for new and modified units for the obvious practicality and policy reasons discussed by EPA in its various interpretive statements. *See, e.g.*, 63 Fed. Reg. 39,857, at 39,857-62 (July 24, 1998). Second, Defendants rely on a statement from the case taken wholly out of context. The section of the *New York* decision cited by Defendants was addressing EPA's attempt to substitute changes in permits for changes in emissions-- a concept that was challenged by Sierra Club and others and was ultimately rejected by the court. Notably, the relevant portion of the *New York* decision confirms that EPA's official interpretation was to use the actual-to-potential test under the 1980 Rule. 414 F.3d at 15.

[7] This distinction was of little importance to the First Circuit. *See* 889 F.2d at 293 (describing the owner's intent to "convert Kiln No. 6 from a 'wet' to a 'dry' cement-making process" and describing the post-modification kiln, interchangeably, as a "converted kiln" and a "new kiln.").

5

was specifically addressing the Rule's application to "'<u>modified units</u>' in the category of units that have 'not begun normal operations'" and to applied the actual-to-potential test to those units. 889 F.2d at 298 (emphasis added). Thus, contrary to Defendants' arguments in this case, the First Circuit correctly held that EPA's actual-to-potential test, expressed in <u>both</u> the preamble to the 1980 PSD Rule <u>and</u> a number of EPA memoranda and PSD applicability determinations, was EPA's interpretation of the regulation and thus must be given "controlling weight." *Id*. at 297 (quoting *Udall v. Tallman*, 380 U.S. 1, 16-17 (1965)). Indeed, the First Circuit recognized the rationale underlying the 1980 Rule's actual-to-potential test: that non-routine changes can allow a unit to regain lost capacity or make other incremental improvements such that pre-modification emissions do not necessarily paint an accurate picture of post-modification emissions, and it is reasonable for EPA to use potential-to-emit as a way to project future emissions. *Puerto Rican Cement*, 899 F.2d at 297; *see also* 63 Fed. Reg. at 39,858. The actual-to-potential test applies to Project 1.

    B.    <u>The actual-to-potential test applies to Projects 5 and 9 because they occurred after the 1992 Rule and Units 3 and 4 are not EUSGUs.</u>

Three of the four projects at issue in this motion (Projects 5, 9, and 10) took place <u>after</u> the promulgation of the 1992 Rule; therefore the plain language of that rule, and EPA's interpretation of it, requires the use of the actual-to-potential test for those three projects.[8] Yet, Defendants ignore EPA's 1992 rulemaking, and rely exclusively on their "expert's" inadmissible legal assertions and pre-1992 case law (*WEPCO*) to support its untenable position that the actual-to-projected-actual test (also known as the actual-to-representative-actual test) applies to its projects.

---

[8] The parties agree that only De Young Unit 5 – where Project 10 occurred – meets the regulatory definition of "electric utility steam generating unit" ("EUSGU") and therefore the legal analysis for this unit is different under the 1992 Rule. *See* Doc. #110 at 13-18; Section III.C., *infra*.

6

Defendants suggest that EPA's post-*WEPCO* rulemaking changed nothing. (Def.'s Resp. at 13-14) (arguing that the 1980 PSD Rule's "begun normal operations" test remained applicable to non-EUSGUs even after the 1992 WEPCO Rule). Quite the contrary, the 1992 Rule was specifically promulgated in response to the conflicting opinions by the Seventh and First Circuits and the Seventh Circuit's invitation that EPA undertake rulemaking to clarify when the actual-to-potential test applies. *WEPCO*, 893 F. 2d at 918 (holding that EPA can undertake notice and comment rulemaking and apply the actual-to-potential test to even "like-kind replacement[s]."). While it is true that some of the language in the 1980 Rule was not changed in 1992, the fact that EPA added significant new language and substantially expanded upon its justification[9] for deciding the conditions by which it would allow an alternative to the actual-to-potential test cannot be ignored. *See* 57 Fed. Reg. 32,314, at 32,323 – 326 (July 21, 1992); *see also WEPCO*, 893 F. 2d at 918 (suggesting further reasoned analysis was missing from the 1980 Rule). The result (to Defendants' chagrin) is that the 1992 Rule, and EPA's controlling interpretation of it[10], make clear that EPA (a) expressly established the use of the actual-to-potential test for all modified sources other than EUSGUs, while also (b) adopting the actual-to-projected-actual test

---

[9] As Defendants' own witness admits, EPA often uses notices published in the Federal Register to explain, define, and interpret complex regulatory language, and these publications are relied upon as binding interpretive statements by regulators and industry alike. (McCutchen Dep. Tr. 136:20 – 137:5.) Interpretations of an agency's own regulations as presented in a Federal Register notice are controlling unless plainly erroneous. *See, e.g.*, *AES Sparrows Point LNG, LLC v. Wilson*, 589 F.3d 721, 729-730 (4th Cir. 2009) (applying "controlling weight" deference to Federal Register notices under *Auer v. Robbins*, 519 U.S. 452, 461 (1997)); *SEC v. Phan*, 500 F.3d 895, 904 (9th Cir. 2007) (same).

[10] The list of EPA interpretations of the applicable regulatory language is long and remarkably consistent. *See, e.g.*, 57 Fed. Reg. at 32,332 (stating in the 1992 Rule preamble, "[t]he regulatory provisions promulgated today are <u>limited to</u> electric utility steam generating units" and explicitly rejecting calls from commenters to extend the Rule's applicability to other sources) (emphasis added); 61 Fed. Reg. 38,250, at 38,254 (July 23, 1996); 63 Fed. Reg. at 39,859 ("The WEPCO rule extended . . . an actual-to-future-actual approach <u>solely</u> to [EUSGUs]") (emphasis added); *id*. at fn. 4 ("The [actual-to-potential] approach applies to all changes at major sources that are not otherwise excluded from [PSD]."); *Detroit Edison*, Doc. #43, Appx. A., at 18, n. 14 ("Under current regulations, changes to a unit that are not routine nor subject to one of the other NSR exemptions are considered to be of such significance that pre-change emissions should not be relied on in projecting post-change emissions"); *see also* Doc. # 110 at 14-18. Michigan has also similarly interpreted the pre-2003 PSD rules. *See* Doc. ##110 at 18, 110-1 at 9 (explaining that the actual to potential (A2P) test as "the traditional applicability determination method used by all sources prior to the March 3, 2003 NSR reforms.").

<u>only</u> for EUSGUs that comply with the rule's post-modification reporting requirements.  Indeed, testimony from Defendants' own expert Mr. McCutchen supports <u>Plaintiff's</u> argument on this point.  (McCutchen Dep. Tr. at 91:4-10.) (acknowledging that under the 1992 Rule, the actual-to-projected actual test was available only for units that "qualify" as EUSGUs.)

In a footnote, Defendants ignore EPA's explicit decision in 1992 to deny the alternative, representative-actual test, to non-EUSGUs by asserting that the test nevertheless applies to Defendants' non-EUSGU Units 3 and 4. (Def.'s Resp.at 22, fn. 9.)  Sierra Club has refuted this nonsensical argument already.  (Doc. #60 at 7-8.)  To adopt Defendants' position would require the Court to effectively overturn the explicit decision EPA made in the 1992 Rule to limit the test to EUSGUs—which this Court does not have jurisdiction to do.  42 U.S.C. § 7607(b)(1) and (2) (requiring challenges to rulemakings to be filed within 60 days in the D.C. Circuit and prohibiting judicial review in enforcement proceedings); *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 581 (2007).  Simply put, after the 1992 Rule, the representative-actual test that Defendants seek to apply instead of the actual-to-potential test in this case can only be applied to EUSGUs, 40 C.F.R. § 52.21(b)(21)(v), and EPA's interpretation is consistent with that definition, 57 Fed. Reg. at 32,3332-333; 63 Fed. Reg. at 39,859 n.4.  The test simply cannot be applied to Defendants' Units 3 and 4 without contradicting EPA's 1992 Rule; thus, the actual-to-potential test applies to Projects 5 and 9

> C. <u>Defendants admit that they failed to comply with the mandatory steps necessary to apply their preferred emission increase calculation method to Projects 5 and 9</u>.

Defendants admit that they did not submit post-project emissions records to EPA as required by 40 C.F.R. § 52.21(b)(21)(v) (1992-2003), yet they ask this Court to ignore the regulation's plain meaning and allow Defendants the benefit of that provision anyway. (Def.'s Resp. at 20.)  But, the regulation gave Defendants two options: (1) use the representative-actual

8

test and demonstrate to the EPA annually through written reports after the projects occurred that emissions have not increased; or (2) apply the actual-to-potential test. (*See* Doc. #43 at 17-22) (citing examples of EPA's oft-repeated interpretation of the 1992 Rule including, *inter alia*, *Detroit Edison* at 18-19). The post-modification reporting requirements of the 1992 Rule could not be more explicit that Defendants do not get the alternative test without doing the reporting. That reporting is critical to the regulatory scheme; without the mandatory reporting, there are no "reasonable means of determining whether a significant increase in representative actual emissions" actually occurred following the modification. 57 Fed. Reg. at 32,325.[11]

Defendants cite three EPA enforcement cases for the proposition that Defendants' failure to comply with the 1992 Rule's reporting requirements has no consequence.[12] (Def.'s Resp. at 20-21.) Of course, none of the cases actually contains such a holding and in none of the cases did EPA ever state any such thing. Instead, Defendants offer rank speculation about EPA's litigation strategy. *Id*. at 20. In *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 869 (S.D. Ohio 2003), EPA proved its case based on the representative-actual test, making the actual-to-potential test irrelevant. *Id*. at 885 (finding for the United States on all eleven PSD claims asserted). Critically, EPA never contended that it could not also prove its case based on the actual-to-potential test, or that the actual-to-potential test could not be applied as a matter of law.

Similarly, Defendants cites to *United States v. Duke Energy Corp*., 2010 U.S. Dist. LEXIS 77956 (M.D.N.C. 2010) and the court's decision to apply that test was based solely on

---

[11] Defendants' sky-is-falling argument that the actual-to-potential test would require "multiple PSD permits every year," Def.'s Resp.at 6, 16, ignores the fact that the test is applied throughout the United States without that result. Defendants ignore the <u>lawful</u> means by which sources undergoing changes may avoid PSD permitting: (a) minor source permitting; (b) netting; and (c) the routine maintenance exemption for truly small and mundane changes. 63 Fed. Reg. 39,858 (minor source permitting); 40 C.F.R. § 52.21(b)(2)(i), (b)(3)(i)(*b*) ("netting" allows certain contemporaneous emission reductions to cancel out increases);

[12] As explained in Sierra Club's brief in support of its first motion for partial summary judgment, cases involving EPA's enforcement discretion are not persuasive, and in any event EPA has consistently reaffirmed the validity of the actual-to-potential test in appropriate circumstances even when electing not to pursue it in a given case. *See* Doc. # 60 at 9 (quoting *U.S. v. Duke Energy Corp*., 278 F. Supp. 2d 619, 640 n. 16 (M.D.N.C. 2003)).

EPA's choice to use that test. The decision is silent about why EPA chose its litigation position (while reaffirming the validity of the actual-to-potential test). (Doc. # 60 at 9.) Defendants fail to mention that the *Duke* court recognized EPA's broad discretion to choose the applicable emission method. *Id*. at *19-20. ("In fact, the [PSD] regulations specifically allow the EPA to use a broad number of factors in determining what post-project emissions will be[.]") (emphasis added). EPA has *never* stated that the actual-to-potential test should not, or could not, be applied where a facility fails to meet the reporting requirements of the alternative test.

Defendants also incorrectly rely on *United States v. Cinergy*, 458 F.3d 705 (7th Cir. 2006). That case determined whether an annual or an hourly emission increase applied; it had nothing to do with the actual-to-potential test. Here, Plaintiff is proving its case based on annual, not hourly, emissions. Moreover, the *Cinergy* decision embraced the fundamental tenet of administrative law that defeats Defendants' arguments in this case: that EPA deserves deference in determining the way to measure emission increases. *See id*. at 711 ("emissions increase" is "a vague statutory term in a regulatory statute [which] can operate as a delegation to the regulatory agency to supply meaning"). Thus *Cinergy* actually supports Plaintiff's application of EPA's interpretations in this case.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiff respectfully requests that the Court grant its Fifth Motion for Partial Summary Judgment Regarding Emissions Increases.

Respectfully submitted on the 10th of June, 2011.

               MCGILLIVRAY WESTERBERG & BENDER LLC

                 /s/ David C. Bender_____

               David C. Bender
               211 S. Paterson Street, Ste 320
               Madison, WI 53703

Tel. 608.310.3560

11